## MOORE *v.* CRAWFORD.

### APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF MICHIGAN.

No. 700. Submitted January 2, 1889. — Decided March 18, 1889.

In January, 1875, a patent issued from the state land office in Michigan for 160 acres of mineral land to McDonald and McKay, who furnished the money for it. The application was made by Moore in their behalf, and under an agreement which the court finds to be established by the proof as made (but not as made in writing) that he was to have one third interest in it in consideration of his services in prospecting. On the 18th of October, 1875, Moore, being then unmarried, executed and delivered a deed of one sixth interest in the tract to Monroe for a valuable consideration, informing him that he (Moore) was to have a deed of one third part from McDonald and McKay, which was probably at that time made out. McDonald and McKay executed their deed to Moore some time in 1875, and deposited it with a third party to be delivered when a debt due from Moore to McDonald should be settled, which was done in 1877. Moore did not know of the existence of this deed, and it was subsequently lost. On the 16th of December, 1880, at Moore's request, and for the avowed purpose of defeating his deed to Monroe, McDonald and McKay conveyed the promised one third interest to the wife of Moore, he having been in the meantime married, and the wife having knowledge of the deed to Monroe, and of the object of the conveyance to her. Moore then entered into possession, and managed the property as if it were his own. Monroe died intestate in Colorado in 1878, and his widow moved into Canada. In the summer of 1871 she first learned that Moore disputed Monroe's title. She wrote him a letter informing him of the claim of the widow and heirs of Monroe to one

sixth part of it, which he received in the fall of 1881, or in the spring of 1882. February 8, 1882, the widow and heirs commenced this suit to compel a conveyance of the one sixth interest to them; *Held:* .

(1) That the transaction must be regarded in equity as if McDonald and McKay had conveyed to Moore, and Moore had conveyed to his wife, she holding one half of the interest conveyed to her, being one sixth of the whole, in trust for Monroe and his heirs;

(2) That Moore was guilty of a fraud in preventing the conveyance to himself which would have inured to the benefit of Monroe, and that his wife, by accepting with knowledge, became a party to it;

(3) That the fact that McDonald and McKay could not have been compelled to convey to Moore because of the want of written evidence of their agreement to do so does not entitle Mrs. Moore to invoke the Statute of Frauds as a defence, they having kept their faith with Moore by conveying under his directions;

(4) That treating Moore's deed as a covenant to convey to Monroe, he would have been precluded from denying the title if the deed of McDonald and McKay had been made directly to him; and that this was not changed by the interposition of a third person, who took without consideration and in order to enable the fraud to be carried into effect;

(5) That the fraud was of such character as to enable a court of equity to decree the relief as against the covenantor, not only under his own name, but under the name of his wife;

(6) That as the contract was binding at the time of Monroe's death, his heirs had the right to compel specific performance; .

(7) That there was no sufficient proof that the deed of Moore to Monroe was set aside by consent, and the purchase abandoned by Monroe;

(8) That the defence of laches, if available at all, was not made out;

(9) That the allegations of the bill as amended were sufficient to support the decree.

The case, as stated by the court in its opinion, was as follows: —

Appellees, the widow and heirs of John Monroe, deceased, filed their bill against Nathaniel D. Moore and Helen Moore, to compel a conveyance of the one undivided sixth part of one hundred and sixty acres of mineral land in Ontonagon County, Michigan, which had been located by Nathaniel D. Moore, under an agreement with James H. McDonald and John McKay, that Moore should have a one third interest in consideration of his services in prospecting for land having iron ore, and selecting and locating that in question. It was upon Moore's application that the patent was issued from the state

land office at Lansing, in January, 1875, to McDonald and McKay, the purchase money being furnished by them and paid over by him.

By the testimony of Moore and McKay it was established that Moore was to have a one third interest, while McDonald admitted that he was to have an interest, but was uncertain whether it was to be one third or one fourth.

One McIntyre testified that the agreement between Moore, McDonald and McKay was in writing, and signed in his presence by McDonald and McKay, but he was not sure whether Moore signed it or not. The execution of such an agreement was denied, and the Circuit Court considered McIntyre's testimony too indefinite as to its terms to warrant proceeding upon it.

On the 18th day of October, 1875, Moore, who was then unmarried, executed and delivered to John Monroe a deed in fee simple, with covenants of seizin, against incumbrances, and of general warranty, for an undivided one sixth interest in said lands, which was duly recorded December 20, 1875. The consideration was two hundred and fifty dollars, of which Monroe paid ten dollars in cash, and for the residue gave his promissory note to Moore, payable one year after its date. Moore informed Monroe at the time, that he had arranged with McDonald and McKay for a one third interest, and that the deed was then probably made out.

Pursuant to their agreement McDonald and McKay, some time in 1875, executed a deed to Moore for a one third interest in the land, which was deposited with one Viele to be delivered to Moore when McDonald and McKay should direct. McDonald testified that Moore was indebted to him, and he wished delivery delayed until the debt was arranged and satisfied, which was finally effected in 1877. Moore does not seem to have known about the execution of this deed, and it appears to have been subsequently lost. McDonald and McKay never denied Moore's right to his interest, but always admitted it, and McDonald testifies that it was understood that Moore should have the interest any time he called for it. In December, 1880, McDonald and McKay conveyed an un-

divided one third interest in the land to Helen Moore, wife of N. D. Moore, who requested the conveyance to be made to his wife for the express purpose, as he admitted, of defeating the deed he had previously given to Monroe for one sixth of the land. Monroe died intestate in Colorado in August, 1878, and Moore, knowing that his deed to Monroe had been recorded, expected Mrs. Monroe would make trouble. No consideration passed when McDonald and McKay executed and delivered this conveyance, and Mrs. Moore was not present when it was executed, but she had been informed by her husband that it was to be made to her, and had full notice of his deed to Monroe. Since the conveyance to Helen Moore, N. D. Moore has substantially managed the property as if it were his own.

Further reference to the pleadings and evidence is made in the opinion.

Hearing having been had upon bill as amended, answer, replication and proofs, the Circuit Court, Judge Sage presiding, delivered its opinion, which is reported in 28 Fed. Rep. 824, and decree was thereupon entered for conveyance to complainants as prayed, and for rents and profits from the date of the filing of the bill, less the amount due on the two hundred and forty dollar note, from which decree this appeal was prosecuted. Mrs. Moore having died pending the appeal, Nathaniel D. Moore, Jr., her sole heir at law, and John McKay, administrator of her estate, were made co-appellants with Nathaniel D. Moore.

*Mr. Daniel H. Ball* and *Mr. Irving D. Hanscom,* for appellants, cited: *Piatt* v. *Vattier,* 9 Pet. 404; *Bumpus* v. *Bumpus,* 53 Mich. 346; *Whiting* v. *Butler,* 29 Mich. 122; *Trask* v. *Green,* 9 Mich. 358; *Groesbeck* v. *Seeley,* 13 Mich. 329; *Palmer* v. *Sterling,* 41 Mich. 218; *Weare* v. *Linnell,* 29 Mich. 224; *Garfield* v. *Hatmaker,* 15 N. Y. 475; *Everett* v. *Everett,* 48 N. Y. 218; *Stebbins* v. *Morris,* 23 Fed. Rep. 300; *Bond* v. *Hopkins,* 1 Sch. & Lef. 413, 429; *Lantry* v. *Lantry,* 51 Illinois, 458; *Walker* v. *Hill,* 21 N. J. Eq. 191; *Hoge* v. *Hoge,* 1 Watts, 163; *S. C.* 26 Am. Dec. 52; *Peckham* v. *Balch.*

49 Michigan, 179; *Scott* v. *Bush*, 26 Michigan, 418; *Raub* v. *Smith*, 61 Michigan, 543; *Glass* v. *Hurlbert*, 102 Mass. 24; *Dung* v. *Parker*, 52 N. Y. 494; *Hutchins* v. *Hutchins*, 7 Hill, 104; *King* v. *Morford*, Saxton (1 N. J. Eq.) 274; *Maxfield* v. *Terry*, 4 Delaware Ch. 618; *Truesdail* v. *Ward*, 24 Michigan, 465; *Peake* v. *Thomas*, 39 Michigan, 584; *Cox* v. *Cox*, 26 Penn. St. 375; *S. C.* 67 Am. Dec. 432; *Bonier* v. *Caldwell*, 8 Michigan, 463; *Texas* v. *Hardenberg*, 10 Wall. 68.

*Mr. John F. Dillon,* for appellants, cited: *Aveling* v. *Knipe*, 19 Ves. 441; *Bartlett* v. *Pickersgill*, 1 Eden, 515 (*semble*); *Smith* v. *Garth*, 32 Alabama, 368; *McCue* v. *Gallagher*, 23 California, 51; *Loomis* v. *Loomis*, 28 Illinois, 454; *Hubble* v. *Osborn*, 31 Indiana, 249; *Jackson* v. *Stevens*, 108 Mass. 94; *Gibson* v. *Foote*, 40 Mississippi, 788; *Botsford* v. *Burr*, 2 Johns. Ch. 405; *Trask* v. *Green*, 9 Mich. 358, 366; *Groesbeck* v. *Seeley*, 13 Mich. 329; *Newton* v. *Sly*, 15 Mich. 391; *Whiting* v. *Butler*, 29 Mich. 122; *Brown* v. *Bronson*, 35 Mich. 415; *Palmer* v. *Sterling*, 41 Mich. 218; *Shafter* v. *Huntington*, 53 Mich. 310; *Emmet* v. *Dewhurst*, 3 McN. & Gord. 587; *Horn* v. *Ludington*, 32 Wisconsin, 73; *Johnston* v. *Glancy*, 4 Blackford (Ind.) 94; *S. C.* 28 Am. Dec. 45; *Purcell* v. *Miner*, 4 Wall. 513; *Williams* v. *Morris*, 95 U. S. 444; *Webster* v. *Gray*, 37 Michigan, 37; *Edwards* v. *Estell*, 48 California, 194; *Stanton* v. *Miller*, 58 N. Y. 192; *Beller* v. *Robinson*, 50 Michigan, 264; *Dean* v. *Dean*, 6 Conn. 285; *Ratliff* v. *Ellis*, 2 Iowa, 59; *S. C.* 63 Am. Dec. 471; *Irwin* v. *Ivers*, 7 Ind. 308; *S. C.* 63 Am. Dec. 420; *Bumpus* v. *Platner*, 1 Johns. Ch. 213; *Peckham* v. *Balch*, 49 Mich. 179; *Blodgett* v. *Hildreth*, 103 Mass. 484; *Jackson* v. *Cleveland*, 15 Mich. 94; *S. C.* 90 Am. Dec. 266; *Morrall* v. *Waterson*, 7 Kansas, 199; *Philbrook* v. *Delano*, 29 Maine, 410; *Gerry* v. *Stimson*, 60 Maine, 186; *Walker* v. *Locke*, 5 Cush. 90; *Bartlett* v. *Bartlett*, 14 Gray, 277; *Titcomb* v. *Morrill*, 10 Allen, 15; *Gould* v. *Lynde*, 114 Mass. 366; *Graves* v. *Graves*, 29 N. H. 129; *Farrington* v. *Barr*, 36 N. H. 86; *Moore* v. *Moore*, 38 N. H. 382; *Hogan* v. *Jaques*, 4 C. E. Green (19 N. J. Eq.) 123; *S. C.* 97 Am. Dec. 644; *Jackson* v. *Garnsey*, 16 Johns. 189; *Sturtevant* v. *Sturte-*

*vant,* 20 N. Y. 39; *S. C.* 75 Am. Dec. 371; *Whiting* v. *Gould,* 2 Wisconsin, 552; *Rasdall* v. *Rasdall,* 9 Wisconsin, 379; *Joliffe* v. *Baker,* 11 Q. B. D. 255; *Kimball* v. *Harman,* 34 Maryland, 407; *Heywood* v. *Tillson,* 75 Maine, 225; *Day* v. *Lown,* 51 Iowa, 364; *Bell* v. *Johnson,* 111 Illinois, 374; *Johnston* v. *LaMotte,* 6 Rich. Eq. 347; *Tuite* v. *Miller,* 10 Ohio, 382; *Tallman* v. *Green,* 3 Sandf. (N. Y.) 437; *Kitchell* v. *Mudgett,* 37 Michigan, 81; *Childs* v. *McChesney,* 20 Iowa, 431; *S. C.* 89 Am. Dec. 545; *Shaffner* v. *Grutzmacher,* 6 Iowa, 137; *Wadleigh* v. *Glines,* 6 N. H. 17; *S. C.* 23 Am. Dec. 705; *Wales* v. *Coffin,* 13 Allen, 213; *Raymond* v. *Holden,* 2 Cush. 264; *Wright* v. *DeGroff,* 14 Michigan, 164; *Jackson* v. *Wright,* 14 Johns. 193; *Clark* v. *Baker,* 14 California, 612; *S. C.* 76 Am. Dec. 449; *Emery* v. *Wase,* 8 Ves. 505; *Weed* v. *Terry,* 2 Doug. (Mich.) 344; *S. C.* 45 Am. Dec. 257; *Duvall* v. *Craig,* 2 Wheat. 45; *Buckmaster* v. *Harrop,* 7 Ves. 341; *Broome* v. *Monck,* 10 Ves. 597.

*Mr. T. L. Chadbourne* and *Mr. L. H. Boutelle,* for appellees, cited: *Irvine* v. *Irvine,* 9 Wall. 617; *Van Rensselaer* v. *Kearney,* 11 How. 297; *House* v. *McCormick,* 57 N. Y. 310; *Bush* v. *Person,* 18 How. 82; *Smith* v. *Williams,* 44 Mich. 242; *D' Wolf* v. *Haydn,* 24 Illinois, 525; *Tefft* v. *Munson,* 57 N. Y. 97; *Smith* v. *Baker,* 1 Young & Coll. 223; *Chew* v. *Barnet,* 11 S. & R. 389; *Way* v. *Arnold,* 18 Georgia, 181; *Goodson* v. *Beacham,* 24 Georgia, 150; *Huxley* v. *Rice,* 40 Michigan, 73; *Parkist* v. *Alexander,* 1 Johns. Ch. 394; *Byrne* v. *Rood,* 54 Michigan, 67; *Barber* v. *Milner,* 43 Michigan, 248; *Patten* v. *Chamberlain,* 44 Michigan, 5; *Newman* v. *Nellis,* 97 N. Y. 285; *Urann* v. *Coates,* 109 Mass. 581; *Carroll* v. *Hart,* 85 Penn. St. 508; *Parrill* v. *McKinley,* 9 Gratt. 1; *S. C.* 58 Am. Dec. 212; *Bowles* v. *Woodson,* 6 Gratt. 78; *Jenkins* v. *Harrison,* 66 Alabama, 345; *Campbell* v. *Thomas,* 42 Wisconsin, 437; *Thayer* v. *Luce,* 22 Ohio St. 62; *Mundy* v. *Foster,* 31 Mich. 313; *Shakespeare* v. *Markham,* 10 Hun, 311; *Kent* v. *Lasley,* 24 Wisconsin, 654; *McClellan* v. *Sanford,* 26 Wisconsin, 595; *Harter* v. *Christoph,* 32 Wisconsin, 245; *Kercheval* v. *Doty,* 31 Wisconsin, 476; *Pringle* v. *Dunn,* 37 Wisconsin, 449; *Howland* v. *Blake,* 97 U. S. 626.

MR. CHIEF JUSTICE FULLER delivered the opinion of the court.

Had the conveyance of McDonald and McKay, lodged in Viele's hands, been actually delivered to Moore, no question would have arisen; but that deed having been suppressed or lost, when Moore subsequently induced McDonald and McKay to convey to his wife, for the avowed purpose of avoiding the deed he had given Monroe, Moore's wife being fully advised of the purpose and paying no consideration for the convey-. ance, the transaction must be regarded in equity as if McDonald and McKay had conveyed to Moore and Moore had conveyed to his wife, she holding in trust for Monroe and his heirs one half of the interest conveyed to her namely, one sixth of the whole.

"Fraud, indeed, in the sense of a court of equity properly includes all acts, omissions and concealments which involve a breach of legal or equitable duty, trust, or confidence, justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another. And courts of equity will not only interfere in cases of fraud to set aside acts done, but they will also, if acts have by fraud been prevented from being done by the parties, interfere and treat the case exactly as if the acts had been done." 1 Story Eq. Jur. § 187.

Whenever the legal title to property is obtained through means or under circumstances "which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to the same, although he may never, perhaps, have had any legal estate therein; and a court of equity has jurisdiction to reach the property either in the hands of the original wrongdoer, or in the hands of any subsequent holder, until a purchaser of it in good faith and without notice acquires a higher right and takes the property relieved from the trust." Pomeroy Eq. Jur. § 1053.

In *Huxley* v. *Rice*, 40 Michigan, 73, 82, it is said: "It is the

settled doctrine of the court that where the conveyance is obtained for ends which it regards as fraudulent, or under circumstances it considers as fraudulent or oppressive, by intent or immediate consequence, the party deriving title under it will be converted into a trustee in case that construction is needful for the purpose of administering adequate relief; and the setting up the Statute of Frauds by a party guilty of the fraud or misconduct, in order to bar the court from effective interference with his wrongdoing, will not hinder it from forcing on his conscience this character as a means to baffle his injustice or its effects." The fraud of which Moore was guilty was in preventing the conveyance to himself, which would have inured to Monroe, and in obtaining it to his wife, so as to reap the benefit which belonged to his grantee. Mrs. Moore stands in her husband's shoes, and by accepting with knowledge is to be treated as a party to his fraud and profiting by it, or as a mere volunteer, assisting him to perpetrate the fraud and to profit by it, and is hence to be held, as he could have been, a trustee *ex maleficio.* Nor do we see that the Statute of Frauds can be invoked as a defence. The fact that McDonald and McKay could not have been compelled to convey to Moore, because of the want of written evidence of their agreement to do so, does not entitle Mrs. Moore to object that they were not legally bound to do what they were morally, they having kept their faith with Moore by conveying under his directions. If McDonald and McKay had violated their agreement with Moore, and in furtherance of such violation had conveyed to a stranger, such grantee might have defended, even though cognizant of the verbal agreement of McDonald and McKay to convey to Moore; but McDonald and McKay never repudiated their obligation to Moore, and conveyed as he directed, thereby, so far as he was concerned, carrying out the trust upon which they held one third of the land.

There is " no rule of law which prevents a party from performing a promise which could not be legally enforced, or which will permit a party, morally but not legally, bound to do a certain act or thing, upon the act or thing being done, to

recall it to the prejudice of the promisee, on the plea that the promise, while still executory, could not, by reason of some technical rule of law, have been enforced by action." *New-man* v. *Nellis*, 97 N. Y. 285, 291; *Patten* v. *Chamberlain*, 44 Michigan, 5.; *Barber* v. *Milner*, 43 Michigan, 248.

Mrs. Moore did not take as a stranger would have taken, but took in execution of the agreement with her husband. Clearly, then, she cannot be permitted to set up a statutory defence personal to McDonald and McKay, who could not, in fulfilling their agreement, transfer an excuse for non-fulfilment.

It is undoubtedly the rule that the breach of a parol promise or trust as to an interest in land does not constitute such fraud as will take a case out of the statute. *Montacute* v. *Maxwell*, 1 P. Wms. 618, 620; *Rogers* v. *Simons*, 55 Illinois, 76; *Peck-ham* v. *Balch*, 49 Michigan, 179; but here McDonald and McKay did not fail to perform their promise, and when they performed, their grantee took one half of the one third, charged with a trust to hold it for Monroe by reason òf the deed of Moore to Monroe, under the covenants of which Moore was equitably bound, when he acquired the title, to hold it for Monroe's benefit. That deed contained a general covenant of warranty.

In *Irvine* v. *Irvine*, 9 Wall. 617, 625, Mr. Justice Strong, speaking for the court, said: "It is a general rule that when one makes a deed of land, covenanting therein that he is the owner, and subsequently acquires an outstanding and adverse title, his new acquisition inures to the benefit of his grantee, on the principle of estoppel;" and in *Van Rensselaer* v. *Kearney*, 11 How. 297, it was pointed out that it is not always necessary that a deed should contain covenants of warranty to operate by way of estoppel upon the grantor from setting up the after-acquired interest against his grantee, the court saying (p. 325): "that whatever may be the form or nature of the conveyance used to pass real property, if the grantor sets forth on the face of the instrument, by way of recital or averment, that he is seized or possessed of a particular estate in the premises, and which estate the deed purports to con-

vey ; or, what is the same thing, if the seizin or possession of a particular estate is affirmed in the deed, either in express terms or by necessary implication, the grantor and all persons in privity with him shall be estopped from ever afterwards denying that he was so seized and possessed at the time he made the conveyance. The estoppel works upon the estate and binds an after-acquired title as between parties and privies."

The rule is thus stated in *Smith* v. *Williams*, 44 Michigan, 242 : " It is not disputed that a deed with covenants of seizin and title would be effectual to give the grantee the benefit of an after-acquired title, under the doctrine of estoppel, but these covenants were absent from the deed in question, and the covenant of quiet enjoyment, it is said, would not have a like effect. No reason is given for any such distinction, and it is not recognized by the authorities. When one assumes, by his deed, to convey a title, and by any form of assurance obligates himself to protect the grantee in the enjoyment of that which the deed purports to give him, he will not be suffered afterwards to acquire or assert a title and turn his grantee over to a suit upon his covenants for redress ; the short and effectual method of redress is to deny him the liberty of setting up his after-acquired title as against his previous conveyance ; this is merely refusing him the countenance and assistance of the courts in breaking the assurance which his covenants had given."

Conceding that a covenant of general warranty operates by way of rebutter to preclude the grantor and his heirs from setting up an after-acquired title rather than to actually transfer the new estate itself, the subsequent acquisition creates an equity for a conveyance in order to make the prior deed effectual. *Noel* v. *Bewley*, 3 Sim. 103, 116; *Smith* v. *Baker*, 1 Younge & Col. Ch. 223.

In *Mc Williams* v. *Nisly*, 2 S. & R. 507, 515, Tilghman, C. J., said that equity will enforce a covenant to convey an estate whenever it shall be acquired by the covenantor, and that the case is not the less strong where there is an absolute conveyance ; and this is cited by Strong, J., in *Bayler* v. *Common-*

*wealth*, 40 Penn. St. 37, 43, wherein it is held that "though a conveyance of an expectancy, as such, is impossible at law, it may be enforced in equity as an executory agreement to convey, if it be sustained by a sufficient consideration." So Gibson, J., in *Chew* v. *Barnet*, 11 S. & R. 389, 392, says, "In the case of a conveyance before the grantor has acquired the title, the legal estate is not transferred by the statute of uses, but the conveyance operates, as I have said, as an agreement, which the grantee is entitled to have executed in chancery, as was decided in *Whitfield* v. *Fausset*, 1 Ves. Sen. 387, 391."

In *Way* v. *Arnold*, 18 Georgia, 181, 193, Pyncheon, having no title, sold to Way with warranty, and subsequently acquiring title, sold to Arnold. It was held that "if Pyncheon, upon consideration, conveyed this subsequently acquired interest, and such was his intention, equity will decree a title to the after-acquired estate, and the second grantee, Arnold, provided he purchased with notice, would be affected by said notice, and could not conscientiously hold the land in dispute."

In *Goodson* v. *Beacham*, 24 Georgia, 150, Mims by warranty deed conveyed to Beacham, Mims having no title at the time, but subsequently acquiring it; Goodson claimed title under an execution sale; and the court say (p. 153): "Mims, when he made the deed to Beacham, had no title, but his deed was an attempt to convey the fee, and it was a deed with a warranty. This shows, first, that it was the *intention* that the *land*, the *whole* interest in the land, should be conveyed to Beacham; secondly, that Beacham had paid the purchase-money. Such being the intention, the consequence would be, that if Mims should afterwards acquire the title, he would be bound to convey it to Beacham, as much so as if the contract were one standing in the form of a bond for titles. Perhaps this would be the consequence, even without the warranty. *Taylor* v. *Debar*, 2 Cas. in Ch. 212; 1 Id. 270; *Wright* v. *Wright*, 1 Ves. Sen. 409; *Noel* v. *Bewley*, 3 Sim. 103; *Smith* v. *Baker*, 1 Younge & Col. Ch. 223; *Jones* v. *Kearney*, 1 Dr. & Walsh, 159, cited in note, 2 Rawle Cov. 438; Sug. Vend. 33, c. 8, § 2; Rawle Cov. 448."

Treating his deed as a covenant to convey, Moore would

have been precluded from denying the title, if the deed of McDonald and McKay had been made directly to him; and if, this being so, he could not call in question his own grant, he could not, by interposing a third person, taking without consideration and to enable the fraud to be carried into effect, in that way defeat it. It was the duty of Moore to take the conveyance for the benefit of Monroe, and Monroe had the right to the enforcement of that duty in equity, in view of the fraudulent device by which Moore attempted to avoid its discharge. The fraud was of such character as enables a court of equity to decree the relief as against the covenantor, not only under his own name but under the name of his wife; and it will not do, under such circumstances, to say that Monroe is remitted to an action for damages for breach of the covenant of warranty, because Moore not only had no title at the time but never afterwards acquired title; for when the conveyance was made to Mrs. Moore it was, as we have held, as if the title had been acquired by Moore himself. Nor is this a case wherein specific performance of the covenant of warranty is sought upon failure of title in the absence of fraud.

It is insisted that if the deed be regarded as a contract to convey, while in such case the heir would ordinarily be entitled to a conveyance from the vendor, yet if the vendor had no title, or if the vendee was not bound by the contract at the time of his death, the heir is not so entitled; but it appears from this record that Moore could have obtained the title in Monroe's lifetime, and the latter could have been compelled to perform on his part, so that the contract was binding at the time of Monroe's death, and his heirs had the right to compel specific performance. The vendor, therefore, would not be liable in one action to the estate, and in another to the heirs.

Monroe died in August, 1878. Moore and McDonald had settled in 1877 the matters which McDonald had given as reasons for not conveying, or for suspending the delivery of the deed placed in the hands of Viele, and McDonald was then ready to convey to Moore, which McKay had always been. Moore was able to perform before Monroe's death, and the right to compel performance which Moore had, his heirs can enforce.

It is strenuously urged that the deed of Moore to Monroe was set aside by agreement, and the purchase abandoned by the latter.

We agree with the learned judge of the Circuit Court in the conclusion at which he arrived in disposing of this contention. The evidence to make out such rescission practically consists of the testimony of defendant N. D. Moore, given on his own behalf. It is only when an oral agreement is clearly and satisfactorily proven by testimony above suspicion and beyond reasonable doubt, that it will be enforced to establish rights in land at variance with the muniments of title, and it is open to question "whether, in any case, after the decease of the grantee, the unaided testimony of the grantor alone, however intelligible and credible he may be as a witness, should be held sufficient to set aside and invalidate the title claimed under it." *Kent* v. *Lasley*, 24 Wisconsin, 654. "Where a written instrument is sought to be reformed upon the ground that by mistake it does not correctly set forth the intention of the parties; or where the declaration of the mortgagor at the time he executed the mortgage, that the equity of redemption should pass to the mortgagee [is relied on]; or where it is insisted, that a mortgagor, by a subsequent parol agreement, surrendered his rights, . . . in each case the burden rests upon the moving party of overcoming the strong presumption arising from the terms of a written instrument. If the proofs are doubtful and unsatisfactory, if there is a failure to overcome this presumption by testimony entirely plain and convincing beyond reasonable controversy, the writing will be held to express correctly the intention of the parties. A judgment of the court, a deliberate deed or writing, are of too much solemnity to be brushed away by loose and inconclusive evidence." *Howland* v. *Blake*, 97 U. S. 624, 626.

Tested by this rule, the evidence is manifestly insufficient to defeat the deed from Moore to Monroe. It must be conceded that the party interposing such a defence should be able to set it up with reasonable accuracy in his pleadings, and Moore's statement on the stand varies so much from that given in his answer as to make it impossible to indulge in any presump-

tions in its favor. The Circuit Court justly comments on this conflict between answer and testimony (28 Fed. Rep. 831); but that ground need not be minutely gone over again here.

The consideration for the one sixth interest was two hundred and fifty dollars, ten dollars in cash and a note for two hundred and forty dollars.

Immediately before the purchase of the land in controversy Monroe had let Moore have money to enter a particular forty acres which he represented had such indications of mineral as showed it would be valuable. Moore did not make the entry because, he says, the land had been previously entered, but he did not return the money to Monroe.

The forty acres was school land, and the minimum price of school lands was fixed by statute at four dollars per acre, 1 Comp. Laws Mich. (1872) 1251, or, for forty acres, one hundred and sixty dollars, and the presumption, in the absence of evidence to the contrary, would be that this was the sum Monroe let Moore have, the purpose to make the particular entry being conceded.

Now, Moore's story as to the rescission is that Monroe came to him and "wanted me to pay him the money that he had given me to enter that land," and that in the conversation that ensued reference was made to the fact that Moore had not yet received a deed to the McDonald and McKay land, and it was finally agreed that Moore should give Monroe his note for one hundred and sixty dollars and surrender Monroe's note for two hundred and forty dollars, and that Monroe should give up his deed; and Moore claims that the money which Monroe had given him to enter the forty acres of school land was one hundred and fifty dollars, and that the one hundred and sixty dollar note was made up of that one hundred and fifty dollars, and the ten dollars which had been paid on the purchase. When confronted with the fact that he had sworn that Monroe gave him the money to enter forty acres of school land, the minimum price of which was one hundred and sixty dollars, his explanation is that, as Monroe had to pay a discount to get the money, "I told him that I would throw off the ten dollars on that account," though why

Monroe could not borrow one hundred and sixty as well as one hundred and fifty dollars, if he borrowed at all, or why Moore should "throw off." ten dollars to the party who advanced the whole capital, or whether Moore had ten dollars to make up the deficiency, (and he admits that he was then quite impecunious,) does not appear.

Whether the money Monroe had let Moore have was one hundred and fifty or one hundred and sixty dollars, and whether the note included the ten dollars paid on the one sixth interest, depends on the testimony of Moore. Mrs. Monroe found the note among her husband's papers after his death, and knew nothing about it except that he told her that it was for money he had loaned Moore. The note itself was not produced; payments had been made upon it in Monroe's lifetime, but none afterwards, until 1881, when sixty dollars was paid to Mrs. Monroe, who cannot remember what the amount of the note was; and this payment was after McDorald and McKay had conveyed to Mrs. Moore, at the request of Moore, for the purpose of cutting out the deed to Monroe, and after the land had commenced to increase in value, to Moore's knowledge but not to that of Mrs. Monroe. When it was made not a word was said to Mrs. Monroe about the outstanding deed to Monroe, either as to having it sent back or having a quit-claim given, and it is quite clear that she was wholly unaware of any connection between that note and the land in controversy, if any such connection in fact existed, as it would seem there did not, if the amount Monroe let Moore have to make the entry was one hundred and sixty dollars. Some small payments had been made on this note to a justice of the peace, in whose hands it had been lodged for collection. He was not sworn as a witness, but Moore is "inclined to think that he is dead." Under the circumstances, it is remarkable that the note when taken up by Moore was not preserved by him, and is not put in evidence. The money was not in fact loaned to Moore by Monroe but given to him for a particular purpose, and when that purpose could not be effectuated, should have been returned at once. Monroe is dead. Is it not dangerous to take Moore's testimony, in face of these facts,

as establishing that the one hundred and sixty dollars covered the ten dollars forming part of the consideration of the purchase under consideration? We think it is, and particularly, as in his answer Moore does not set up that the money was given him for the entry of a specified tract of forty acres, nor state any reason why it was one hundred and fifty instead of one hundred and sixty dollars, but says the money was furnished by Monroe to enter land, "if he should know of any that was desirable."

Equally unsatisfactory is the evidence as to Monroe's note for two hundred and forty dollars. Moore alleges in his answer that it was part of the agreement to rescind that he should cause this note to be surrendered to Monroe, and that one John McKay, in whose possession it was, "as he had been previously requested by said Nathaniel D. Moore," delivered the note to Mrs. Monroe, and it was cancelled; but it is not to be questioned, upon the evidence, that the note was handed to Mrs. Monroe, not at the request of Moore at all, who knew nothing about it until a year, or perhaps nearly six years, afterwards, but at her solicitation; and it was not only not cancelled, but carefully preserved and produced upon the trial, a fact inconsistent with a rescission to be accomplished by its destruction, but entirely in accordance with Mrs. Monroe's testimony, that her getting the note was accidental, and that, as came out on her cross-examination, when she showed it to her husband, he told her "to put it by." Such a direction on his part is irreconcilable with the theory that he had sent her to the McKays for the note because the bargain had been declared off, while it sustains the view that he had no intention to throw up the purchase. This note had been given to William McKay, according to Moore, to raise money on; failing in which, William had left it with his brother John, or his wife, who testifies he gave it to her "to keep or to give back to Mrs. Crawford (then Mrs. Monroe), *or to collect*." Mrs. McKay was Mrs. Monroe's sister and gave her the note, cautioning her that she must take care of it so as to produce it in case it was asked for by William McKay. This was in July, 1876, but Moore fixes the date of the conversation with Monroe as in

August or. September, or, as he finally believes, early in October, 1876, which, if true, would show that Mrs. Monroe's possession of the note had nothing whatever to do with an agreement that it should be surrendered. Indeed, Moore does not contend that it had, but testifies that Monroe said he could get the note from the McKays, whom, however, Moore does not pretend he directed to deliver it. There is a direct conflict between Mrs. Crawford and the McKays, as to her statements at the time she took the note; but we are not inclined, therefore, to reject her account of the transaction, so far as bearing upon whether she had authority to act for her husband on that occasion or not. Granting that Mrs. Monroe was desirous of getting the note, because she feared Monroe would never obtain title, and considered Moore's deed worthless, this did not bind Monroe, and her statements could not be used for that purpose. It should further be observed that, while Moore avers in his answer, which he subscribed, that Monroe was to quit-claim to him, he states in his testimony that Monroe said he had not recorded the deed and would send it back, although the evidence discloses it was recorded December 20, 1875; and also that though Moore and Monroe lived at the time within three miles of each other, yet Moore never asked Monroe either to quit-claim or return the deed, now giving as an excuse that he did not wish "to stir it up more than was necessary," and did not wish to urge him while the other note remained unpaid. If he was not entitled to demand a release until he had paid the one hundred and sixty dollar note, it would hardly be just to allow him to cease paying and not resume until years after, when the land had increased in value, and Monroe was in his grave, and then treat such payment to Mrs. Monroe, though he kept her in ignorance of any connection between it and the land, as performance of the alleged agreement of five years before.

Upon a careful examination of the evidence, it amounts to no more than this: Monroe expected and desired to obtain the land; he found that McDonald and McKay had not made a deed to Moore, and doubt was expressed whether they ever would. He wished to collect the money which Moore had

wrongfully kept, and which had no relation to the other trans-action. He retained possession of the two hundred and forty dollar note, so that Moore could not make use of it, not intend-ing to cancel it, but to hold it for payment when Moore ob-tained the title. In accepting payments on the one hundred and sixty dollar note, he was only receiving what Moore origi-nally owed him, assuming that the ten dollars was not included. If there ever was such an arrangement as contended for, it was evidently not to be carried out on the part of one unless or until carried out by the other, and was not carried out by either; and the payment of the sixty dollars to Mrs. Monroe, ignorant as she was of the facts, cannot be regarded as accept-ance of performance. In any point of view in which this evi-dence can be considered, we do not feel justified in denying complainants relief upon the ground of an abandonment of the deed of Moore to Monroe.

In our judgment, the defence of laches is not made out, even if the minority of the heirs did not preclude it. The deed of McDonald and McKay to Helen Moore is dated December 16, 1880, and was recorded March 16, 1881. Dur-ing all this time Mrs. Monroe and her children were living in Canada. Mrs. Monroe, when on a visit to Houghton County, in the summer of 1881, first learned that Moore disputed their title, and in the fall of that year she was advised by Mr. Mc-Kay to "hire a lawyer or attorney." She did so, and he wrote a letter to Moore, informing him of complainants' claim. Moore testifies as to its receipt that "it must have been in the fall of 1881 or in the spring of 1882. I am not sure of it."

February 8, 1882, this suit was commenced in the Circuit Court for Ontonagon County, Michigan. This cannot be held to be unreasonable delay. The answer of defendants averred: "It is only since said [mineral] discoveries, made at the ex-pense of these defendants and said McDonald and McKay, that these complainants have claimed to have any interest therein;" but all that was done in developing the land was by the Cambria Iron and Steel Company, and no actual dis-coveries of ore had been made before the bill was filed.

Moore is asked by his counsel, and answers as follows:

" Q. When was it first ascertained that the property had value beyond what you knew of at the time you first went over it for iron ore? A. The spring of '82 was the first developments that was made on that property by the Cambria Iron and Steel Company. They worked considerably on it in '81, but hadn't shown up anything until the spring of '82."

McDonald testifies: "We let an option to the Cambria Iron and Steel Company of Johnstown, Pa., to mine ore if they could find it; gave them a privilege of exploring for iron; if they found iron they was to pay us so much for the iron. . . . That must have been in '81. . . . Q. About what time was it that they first developed mineral value there; that is, to show that there was mineral value there? A. Well, in the spring, I couldn't say what time that was, but it must have been in the following spring; . . . the following spring after we gave the option."

While this shows that Mrs. Monroe had no reason to suppose the land had increased in value when she began her suit, Moore, from his knowledge of the property, and his being on the ground, must have been aware, when he paid Mrs. Monroe, and probably as early as when the deed was given to his wife, that the property was likely to improve in value. He says the option of the Cambria Iron and Steel Company was in 1880 or 1881, and if it was after his wife got her deed, it was *shortly after.* The inevitable inference from his conduct is that he did not ask McDonald and McKay to convey, and did not propose to pay up the note until roused into activity by the prospect of gain.

The bill and amendments state the deed from Moore to Monroe of one sixth of the land; that McDonald and McKay held "an undivided one third thereof in trust for the said Nat. D. Moore by an arrangement between the said McDonald and McKay, on the one side, and the said Moore, on the other, entered into before or at the time the said McDonald and McKay acquired said title;" that the conveyances by McDonald and McKay to Helen Moore "were made at the instigation of said Nat. D. Moore, with the intent and purpose of defrauding these complainants out of the estate in fee con-

veyed and assured, and intended to be conveyed and assured, to the said John Monroe by the said Nat. D. Moore as aforesaid, by lodging the apparent legal title in his wife's name, but for his own benefit and use;" "that the said Helen Moore paid no consideration for said conveyance, and that said interest vested in her as trustee for her husband, Nat. D. Moore, and for the said John Monroe, his heirs and assigns;" that the deed to Helen was procured by said Nat. D. and said Helen to be made "for the purpose of cutting out complainants' title to the undivided one sixth of the said land and of depriving them thereof;" that the transaction "is and ought to be held to be of the same effect as if the said McDonald and McKay and their wives had conveyed said interest directly to the said Nat. D. Moore instead of to his wife, and that the said Moores, husband and wife, ought to be and are estopped by the terms of Moore's said conveyance to Monroe, from claiming or asserting that, as to the one sixth interest in said land conveyed by the said Nat. D. Moore to the said John Monroe, the said Helen Moore has any title or interest therein as against said complainants; and they further charge that as to said one sixth interest the title is in them by virtue of the premises; that at the time of said conveyance by Nat. D. Moore to John Monroe said Moore was unmarried, and that said Helen Moore gave nothing for either or any of said conveyances nor for said interest in said land; and that she took the same with full notice and knowledge of complainants' rights, obtained as aforesaid, by deed from said Nat. D. Moore to said John Monroe."

The original bill charged also that a conveyance was made by McDonald and McKay to Moore, and fraudulently suppressed before the conveyance to said Helen.

We think the allegations of the bill as amended are sufficient to support the decree.

McDonald and McKay held in trust for Moore, that is, upon the trust created by their obligation to convey to him on request; they not only did not deny the trust but conveyed on Moore's request to his nominee, and fraud is charged against Moore and his wife in procuring the conveyance to the latter.

The prayer of the bill was "that the said Helen Moore be compelled by the proper decree of this court to execute and deliver a good and sufficient warranty deed or deeds of the undivided one sixth part of said premises to these complainants, in the proportions to which they are respectively entitled, as sole heirs of said Monroe," and as there is enough in the bill as amended to warrant relief, and as the defendants could not have been taken by surprise, we do not think the decree should be reversed on the ground that the allegata and the probata do not sufficiently agree to justify it. It is true, there is no offer to pay the balance of the purchase money, but the case shows that a tender would have been but an empty show, and as the court had it in its power to require payment of the two hundred and forty dollar note, thus completing performance by Monroe, and as it did this by its decree, the allegation would have been merely formal and became immaterial.

The decree of the Circuit Court is

*Affirmed.*