Peter R. CORBIN, Plaintiff,

v.

Mark M. CORBIN and Corbin Supply
Company, Defendants.

Civ. A. No. 76–203–Mac.

United States District Court,
M. D. Georgia,
Macon Division.

March 11, 1977.

E. S. Sell, Jr., Sell, Comer & Popper, Macon, Ga., John F. Corrigan, Corrigan, Weber & Moore, Carl M. Stewart, Jacksonville, Fla., for plaintiff.

Timothy K. Adams, H. Jerome Strickland, Jones, Cork, Miller & Benton, Macon, Ga., for defendants.

OWENS, District Judge:

Plaintiff Peter R. Corbin, a 28 year old resident of Jacksonville, Florida, filed a complaint against his 26 year old brother Mark M. Corbin, a resident of Macon, Georgia, alleging Mark's misconduct as majority stockholder, president and chief executive officer of Corbin Supply Company in which plaintiff is also a stockholder and praying for preliminary and permanent injunctive relief. His prayer for preliminary injunctive relief came on for evidentiary hearing on February 1, 1977. On February 17 Corbin Supply Company, a Georgia corporation, was added as a party defendant. This constitutes the court's order granting preliminary injunctive relief. Rule 65(d), Federal Rules of Civil Procedure.

## THE FACTS

Corbin Supply Company since its corporate inception in 1913 has successfully and profitably sold mine and mill supplies in Macon, Georgia. The original controlling stockholder C. C. Corbin died in 1947 and Charles C. Corbin became controlling stockholder and chief executive officer of the corporation. In 1975 Charles C. Corbin having reached 62 years of age and having decided to soon retire, offered to sell his stock in the defendant corporation to his three sons—the plaintiff Peter, the defendant Mark, and Charles, Jr. who is not a party. At that point in time the stock of the corporation was owned as follows:

| Stockholder | Shares |
| --- | --- |
| Charles C. Corbin | 276 |
| Margaret Corbin (Mrs. Charles C.) | 13 |
| Charles C. Corbin, Jr. | 41 |
| Mark M. Corbin | 41 |
| Peter R. Corbin | 41 |

Charles, Jr. declined to purchase any of his father's stock. Peter and Mark discussed the situation with their father and his lawyer Albert P. Reichert and ultimately entered into a contract on July 10, 1975, to each purchase one-half of their father's stock in the defendant corporation. Each agreed to pay his father one-half of $1,871.80 per month for the remainder of his life. To arrive at this monthly annuity the father's stock is valued in the contract at $201,204.00. See Exhibit "C" to complaint. The father therefore sold his controlling 276 shares valued at a total of $201,204.00 for a monthly annuity of $1,871.80. Explicitly or tacitly Charles C. Corbin and his sons Peter and Mark, neither of whom had or now has a monthly after-tax income sufficient to pay monthly payments of $935.90 to his father, at the same time agreed that the defendant corporation would advance $935.90 each month to each son to enable each son to make his $935.90 payment to his father, charging the advance as an account receivable owed by the recipient. Company checks were mailed to Peter each month in Jacksonville, Florida; upon receipt Peter deposited each check and then sent his personal check. Until the filing of this lawsuit on December 30, 1976, the father had received every payment due under the contract and each one had been paid with funds advanced by the corporation to either Mark or Peter.

Prior to the sale by Charles C. Corbin of his 276 shares to Peter and Mark, Charles C. Corbin, Jr. agreed on November 15, 1974, to sell Mark 37 of his 41 shares for $22,000 to be in 60 monthly installments. Since defendant Mark Corbin testified that he did not have a personal checking account and

since the August 31, 1976, corporate financial statement, Exhibit "G", shows $37,-341.00 then due from stockholder-defendant Mark Corbin, the evidence as it presently stands indicates that the corporation paid all that Charles C. Corbin, Jr. received for his 37 shares. Payments were completed in September 1976, and these 37 shares were reissued to defendant Mark on September 29, 1976. After this lawsuit was filed Mark says he paid the corporate advances.

Prior to Charles C. Corbin's sale of his 276 shares and Charles, Jr.'s contracting to sell 37 of his 41 shares, the defendant corporation with the consent of its stockholders had elected to have its income taxed under Subchapter S, Section 1372 of the Internal Revenue Code. Up until the commencement of this lawsuit it had been the corporation's practice to declare and distribute the entire net taxable income of the corporation as dividends prior to March 15 following the close of the corporation's taxable year on December 31. As to Peter, his account receivable was deducted from such dividends.

The charter of the defendant corporation was amended in 1931 so as to authorize it "(c) To buy and hold its own stock as treasury stock" and its by-laws were amended by its stockholders in May 1931 to revoke all authority of its board of directors and vest such authority in the stockholders. According to those by-laws stockholder meetings are on the second Tuesday in February, all officers are elected by the stockholders, the stockholders fix the salary of the president, and the salaries of all other officers and employees are fixed by the president.

A stockholders meeting was held March 29, 1975, at which time the father announced his intention to sell. After the July 10, 1975, sales contract was executed, a special stockholders meeting was held with only Charles C. Corbin, Sr. and defendant Mark Corbin present. Notice was not given to other stockholders. Mark voted his newly acquired stock to elect himself president. Exhibit "D" to complaint.

Minutes of a purported but not held stockholders meeting of March 15, 1976, were prepared by defendant Mark Corbin. Exhibit "E" to complaint.

The next stockholders meeting duly called and held was in November 1976. Between his election as president and that meeting defendant Mark had first leased an Eldorado Cadillac convertible in the company name; subsequently had transferred the Eldorado lease into his individual name; caused the company to purchase a Lincoln Continental in which he drives to and from the office; caused the company to purchase a Fleetwood Cadillac to be used to entertain the company's banker and customers; and caused the company to spend $8,500.00 to furnish one room of his recently purchased condominium as an office for him to use at night.

At the November 1976 meeting Mark read the following prepared statement to the stockholders:

I have called this special meeting of Corporate Stockholders and advisors in order to announce the beginning of a Corporate expansion program for Corbin Supply Company. I have included the Corporate Lawyer and CPA in this meeting because I want you to know that I have sought their professional advice in studying and working on this program. They are here to answer any questions you might have and to help you realize such a program is the best thing the Company can do if it is to grow and stay of sound condition. The main thing I want you to realize is that this program has been thought out very carefully, has received the advice and approval of professionals and that this program will take place one step at a time and that each step will be thought out and planned very carefully before carrying it out and moving on to the next one.

The first step that the company must take in this program is that it has to start accumulating it's [sic] earnings in order to provide the necessary capital which the company must have in order to fund its growth. By accumulating it's [sic] prof-

its, the company will be able to expand at the fastest rate, there will be a lesser amount of it's [sic] profits paid out to the government in taxes each year, and this will be the safest and soundest method of growth for the company.

In accumulating its profits, the company will be retaining its earnings each year and will be reinvesting those profits instead of paying them out in annual dividends. By plowing all the profits back into the company each year, the assets of the Company will increase, therefore increasing the value of Corbin Supply Company stock. The increase in the value of the stock will be due to the deletion of the annual dividends paid out to the stockholders at the end of each fiscal year.

Now, the only problem this creates concerns Peter, because he has been drawing against his future dividends in order to make his annuity payments. Since he will not be receiving this income now, I feel obligated to get him out from under this annuity if he wishes to do so. The only alternative I have to relieve his obligation under this annuity is to offer to let Corbin Supply Company buy his interest in the company as treasury stock. It makes no difference to me whether or not he chooses to accept this offer, but I do feel that it is my responsibility to offer him a way out from under this annuity. Since this offer is made to Peter, I also feel obligated that the corporation should make the same offer to any other stockholders (those being Margaret D. Corbin, owner of 13 shares, and Charles C. Corbin, Jr., owner of 4 shares), if they would rather have cash for their stock now instead of keeping the stock and having it increase in value in the future. Let me reiterate before I close, that it makes no difference to me whether or not anyone wants to sell their interests in the company, the choice is yours. (Plaintiff's Exhibit 2).

Plaintiff Peter refused to sell his stock to defendant Mark at or immediately after that meeting. Later defendant Mark drove to Jacksonville, Florida, in one of the company cars and talked to plaintiff Peter at his home until early in the morning to try to persuade Peter to go along. Peter refused and filed his complaint in this court.

Plaintiff Peter Corbin's present income is limited to his salary as an associate in a Jacksonville, Florida, law firm. Other than the stock of the defendant company, plaintiff Peter has no significant assets. Without the monthly $935.90 advances from the company, he cannot pay his father the $935.90 monthly payments that he is required to make.

Defendant Mark as is shown by the lease and purchase of luxury automobiles, the company expenditure of $8,500.00 to furnish one room of his home as an office, and the advance to himself of $37,341.00 by the company at a time when the company at defendant Mark's direction had advanced plaintiff Peter only $2,836.00, can use the financial resources of the company to furnish himself funds to pay his monthly obligations of $935.90 to his father. Since Mark, as previously noted, has no personal checking account, it is apparent that he is using company money to pay his personal obligations and intends to continue doing so until forced to stop by court order.

## THE ISSUES

Plaintiff now asks that a preliminary injunction against the defendants be issued which would:

(a) prohibit the defendant Mark Corbin from refusing to cause the corporation to advance funds each month to the plaintiff Peter to be used by him to meet his annuity obligation to their father, and from refusing to cause the corporation to declare and pay dividends before March 15, 1976 as has been the custom in the past so as to maximize tax advantages under the Subchapter S tax status the parties enjoy, and likewise prohibit the corporation from refusing to advance funds and pay dividends in that manner in the future;

(b) prohibit the defendant Mark from further wasting corporate assets; and

(c) prohibit the defendant Mark from voting or otherwise exercising any rights or privileges incidental to the 37 shares of stock in the defendant corporation which Mark claims he owns by purchase from Charles Jr., but which Peter asserts belong to the defendant corporation as treasury stock because corporate funds were used by Mark to acquire them until true ownership of them and consequently majority ownership of the corporate stock can be determined.

■ Whether a preliminary injunction on each of these matters as requested should issue must be determined by an examination of four factors enunciated in *Blackshear Residents Organization v. Romney*, 472 F.2d 1197, 1198 (5th Cir. 1973):

(1) whether the plaintiff is likely to prevail on the merits;

(2) whether the plaintiff is in danger of suffering irreparable harm;

(3) whether the potential harm to the defendant from issuance of the injunction outweighs the possible harm to the plaintiff if injunctive relief is denied;

(4) whether issuance of a preliminary injunction will serve the public interest.

I. *The Merits.*—The facts so far adduced clearly demonstrate that the plaintiff is likely to prevail on the merits on all his claims. By his own admission, the defendant Mark intends to obtain the stock of his brother Peter by freezing him out. Using his positions as president and purported majority shareholder, Mark plans to cause the corporation to cease its traditional practices of distributing all its earnings under its Subchapter S status and of advancing funds to Peter against those dividends so that Peter can meet his annuity obligation to his father. The company's practices are, of course, crucial for Peter who, unlike his salaried brother Mark, can otherwise derive no financial benefit from his stock; furthermore, without those dividend payments, Peter lacks the funds to meet his annuity obligation to his father or, more important, to pay federal income taxes on his share of the corporate income which are due under Subchapter S regardless of whether dividends are paid out. The obvious intent and desired result of the manipulation of corporate funds and prerogatives by Mark is to make Peter's stock valueless in Peter's hands, thereby forcing him to sell it to Mark.

Mark's practices being designed to force a sale of stock, they are "in connection with" the sale or purchase of a security and, if fraudulent, are prohibited by Rule 10b–5 of the Securities and Exchange Commission which provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) to employ any device, scheme or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading or

(3) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

The rule provides a private cause of action which can be asserted in a federal court by those injured by the violation.

■ As recently explained in *Green v. Santa Fe Industries, Inc.*, 533 F.2d 1283 (2d Cir. 1976), a scheme by a majority stockholder to freeze out a minority shareholder, when the plan lacks any legitimate corporate purpose, is a breach of the majority shareholder's fiduciary obligation to deal fairly with minority shareholders, and is fraudulent as against them. The court noted, quoting *S.E.C. v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194, 84 S.Ct. 275, 284, 11 L.Ed.2d 237, 247 (1963), and *Moore v. Crawford*, 130 U.S. 122, 128, 9 S.Ct. 447, 448, 32 L.Ed. 878, 880 (1880):

Fraud, indeed, in the sense of a court of equity properly includes all acts, omissions and concealments which involve a breach of legal or equitable duty, trust, or confidence, justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another.

That court further observed, quoting *Pepper v. Litton*, 308 U.S. 295, 306–07, 60 S.Ct. 238, 245, 84 L.Ed.2d 281, 288–89 (1939), that controlling shareholders and directors are fiduciaries whose

> . . . dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. 533 F.2d at 1290.

The court in broad terms made plain that federal law, and particularly section 3 of Rule 10b–5, places a duty of essential fairness on a majority shareholder when he seeks to acquire minority interests:

> When controlling shareholders of a publicly held corporation use corporate funds to force extinction of the minority shareholders' interest for the sole purpose of feeding the pocketbooks of the controlling shareholders, such conduct goes beyond mere negligent mismanagement and is properly cognizable as "an act, practice, or course of business which operates or would operate as a fraud." *Id.*

Although *Green, supra,* is distinguishable in that it involved a freeze-out of minority shareholders in a public corporation, its principle is clear and not limited to such situations: a majority shareholder cannot use his position to manipulate corporate affairs so as to deprive a minority shareholder of the value of his property for the purpose of freezing him out. *Accord, Davis v. Davis,* 526 F.2d 1286 (5th Cir. 1976). And, of course, an injunction clearly will lie to prevent such a violation of law. Thus, the defendant Mark having admitted in a pre-pared writing his intent to freeze his brother out by depriving him of customary financial benefits incidental to ownership of stock in the corporation, and having failed to demonstrate any likelihood of establishing any legitimate corporate purpose to justify his actions, the plaintiff is most likely to prevail on the merits with respect to his requested injunctive relief pertaining to dividends.

The plaintiff is similarly likely to prevail on the merits of his complaint that the defendant Mark is wasting corporate assets. It needs no citation of authority to conclude that corporate funds simply cannot be used to meet an officer's personal desires and obligations; further, the defendant Mark has not shown any business purpose or need, and this court cannot perceive one, for this corporation engaged in the business of supplying mine and mill equipment and supplies to own two luxury automobiles, or to furnish a corporate officer's office at his home to the tune of $8,500.00. Finally, it is peculiarly inappropriate, a breach of an officer's fiduciary obligation to the corporation and its shareholders, and, simply, a waste of corporate assets, for an officer of a corporation to cause the corporation to advance him— without reserving any kind of security to guarantee repayment, or, indeed, even bothering to obtain a written evidence of indebtedness—a sum in excess of his annual salary. Again, an injunction clearly lies to prevent the continuation of such improper conduct, and plaintiff is most likely to prevail on the merits of his request for one.

Finally, it is likely that plaintiff will prevail on his contention that the 37 shares which Charles Jr. owned which Mark paid for with checks drawn on the corporation's account are treasury shares rather than Mark's. Georgia law defines treasury shares as "shares of a corporation which have been issued, have been subsequently acquired by and belong to the corporation, and have not, either by reason of the acquisition or thereafter, been canceled." Ga. Code Ann. § 22–102. It would seem that, *prima facie,* a corporation has acquired

something which it has paid for. Accordingly, consideration for Charles Jr.'s stock having been furnished by the corporation, it rather than Mark has acquired that stock and it rather than Mark owns it. Unless Mark can demonstrate—which to date he has not done—that the corporation paid for Charles Jr.'s stock on his behalf pursuant to a *bona fide* loan arrangement, the plaintiff will have succeeded in establishing that the shares are treasury stock. The court is unpersuaded that Mark's actions subsequent to the filing of this lawsuit in paying back a loan which he probably intended to forget about is alone sufficient to establish such a *bona fide* arrangement.

In sum, plaintiff has demonstrated beyond peradventure that he has met the first prong of the test for the issuance of a preliminary injunction.

■ II. *Irreparable Harm.*—Although a mere threatened monetary injury, which can be redressed in damages, is insufficient to establish the irreparable injury essential to the issuance of a preliminary injunction, *e. g., Sampson v. Murray,* 416 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974), much more than that is involved here. In the ordinary case, an improper failure to pay dividends might be redressed simply by a retroactive grant of dividends. Here, however, significantly adverse tax consequences to the plaintiff will result if the dividends to which he is likely entitled are not paid by March 15, 1977; because of Subchapter S provisions, distributions after that date will not be entitled to the same tax-free receipt which distributions before that date receive. Furthermore, as long as the halt in the customary pay-out of corporate funds is allowed to continue, the plaintiff remains under financial pressure, Mark's plan to abuse his trust and to use that leverage to acquire the plaintiff's stock goes forward unabated, and the plaintiff because of his financial circumstances might well lose his property before the court can act. Faced with adverse tax consequences and the possible loss of his property if the injunction does not issue, the plaintiff has shown more than a simple monetary deprivation arising from the defendant's actions and has amply demonstrated that he will suffer irreparable injury if a preliminary injunction does not issue on the dividend issue.

Irreparable harm has similarly been shown by the plaintiff with respect to the claims of corporate waste. Were the defendant Mark an individual with significant financial resources independent of the corporation who could be expected to repay the corporation for any waste he may subsequently be found to have committed, the issuance of a preliminary injunction might not be authorized. Here, however, Mark's only real assets are those which are derived substantially from the corporation—the very assets which the plaintiff claims Mark is wasting. The corporate property which Mark is likely to dissipate is the sole source on which he could rely to compensate the corporation for any loss. Clearly, the threatened wrongful appropriation of property in which a plaintiff has an interest by a defendant who likely has no authority to do so and who further has no way to redress the damage arising therefrom amounts to irreparable harm.

Finally, the plaintiff has shown irreparable harm if the defendant Mark is allowed to use as his own the stock of Charles Jr. which in all likelihood belongs to the corporation. With the voting power and other incidents of ownership of that stock, Mark would not only continue to derive benefits from something—to the detriment of the plaintiff—which is probably not his, but also would be in a position to continue, and likely would continue without restriction other than that provided by this court, to use the corporation and its assets for his sole and exclusive benefit. It is clearly necessary for this court to deprive him of the use of property which is not his and which if he retains he will continue to use contrary to his fiduciary obligations to the irreparable injury of the plaintiff.

III. *Balancing of Harm.*—While as shown above the plaintiff will be irreparably harmed if an injunction does not issue, it is unlikely that the defendants will be significantly injured. The injunction does

no more than perpetuate the *status quo* until the merits can ultimately be resolved, and does not deny either Mark or the corporation the ability to do anything which is consistent with normal business practices and the conduct of corporate affairs in good faith.

IV. *Public Interest.*—Although the public interest in the sense of impact on members of the public is nonexistent, it is nevertheless appropriate to observe that sound public *policy* is served by this injunction. The compelling conclusion in this case and the fact which pervades each and every instance of Mark Corbin's conduct is that he has acted in the utmost bad faith with complete disregard for the interests of his fellow shareholder-brother, his father-annuitant-benefactor, and the corporation on whose continued good health all rely. Having received a portion of his father's and grandfather's wealth which those gentlemen obviously wanted their offspring to share, he has sought to appropriate it all for himself through a misuse of that which has been *given* to him. Public policy ought not allow such ungrateful. behavior to take place by misuse of the corporate structure which society has allowed individuals to use to facilitate their business transactions.

## THE INJUNCTION

 Plaintiff having demonstrated that he is entitled to a preliminary injunction,

IT IS THEREFORE ORDERED, AD-JUDGED and DECREED that the defendant Mark Corbin and the defendant Corbin Supply Company, and their officers, agents, servants, employees, and attorneys, and all persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, are hereby enjoined:

(a) from Mark's exercising or the corporation permitting Mark to directly or indirectly exercise the rights of ownership to 37 shares of stock now standing in Mark's name as a result of having been transferred from Charles C. Corbin, Jr., for any purpose whatsoever other than to comply with this injunction;

(b) from failing to declare and pay by physical delivery to all shareholders before midnight March 15, 1977, dividends [1] from 1976 earnings in an amount arrived at in the same manner that dividends for the years 1974 and 1975 were arrived at;

(c) from failing to pay unpaid advances and from failing to continue to advance and pay $935.90 each and every month from company funds to plaintiff Peter R. Corbin to enable him to pay plaintiff Peter and defendant Mark's father his agreed monthly annuity;

(d) from using company funds—to purchase automobiles; to decorate or furnish the home of defendant Mark, the company premises or any other premises other than as consented to in writing by all stockholders; to pay in any manner for the operation of any vehicle other than company owned vehicles; to travel anywhere outside the area in which the company actually transacts business except with consent in writing of all other stockholders; to advance money to defendant Mark in excess of whatever amount is and has been advanced to plaintiff Peter; to pay attorney's fees and costs of this litigation except as approved in writing by the court; and to otherwise do anything other than operate Corbin Supply Company in the manner in which it was operated before defendant Mark became president and in accordance with the bylaws of the company.

This order contemplates that defendant Mark will remain as president and chief operating officer of the company pending final resolution of this complaint, and this order will continue in full force and effect until further order of the court.

The clerk is directed to cause a copy of this order to be delivered *instanter* to the attorneys for each of the parties.

1. Dividends on the 37 shares of stock acquired from Charles Jr. purportedly owned by the defendant Mark shall be paid into the Registry of this court pending determination of the ownership of that stock.