GORDON v. SMITH et al.[1]

(Circuit Court of Appeals, Fifth Circuit. May 15, 1894.)

No. 114.

1. MORTGAGE—REDEMPTION BY EQUITABLE ASSIGNEE OF MORTGAGOR — SUBROGATION.

After foreclosure of a mortgage held by an agent for a bank and purchase of the property for the bank at the foreclosure sale, the mortgagor, having a statutory right of redemption, subject to liens of judgments as well as to the rights under the mortgage, obtained a loan from complainant, on security of a new mortgage of the property, by representations that he had a perfect title thereto, and thereupon previous negotiations between the mortgagor and the bank for redemption of the property by him

[1] Rehearing pending.

were partially carried into effect by the appropriation of part of the loan to the purchase by the bank of certain judgments, liens against the property, the bank receiving the money from him for that purpose, leaving the balance of the redemption money to be paid thereafter; but the mortgagor became insolvent. *Held,* that the mortgagor had a right to redeem, founded on contract as well as on the statute, which, in view of his representations, his insolvency, and his neglect to act, might be asserted by complainant, as his equitable assignee, and subrogated to his rights, and enforced against the bank, it not being impossible for its rights and claims to be divested on equitable terms.

2. SAME—BONA FIDE PURCHASER.
In complainant's suit to establish his claim and to redeem, it appeared that before the loan he was advised of circumstances which should have put him on inquiry as to the bank's claim. *Held,* that as he did not seek priority, but the simple right to redeem, and as the bank retained the benefit of part of the loan by him to the mortgagor, it was not important that complainant was not within the strict definition of an innocent purchaser for value.

3. SAME—TENDER OF REDEMPTION MONEY.
Before the expiration of the mortgagor's right of redemption, complainant, for the purpose of redeeming from the foreclosure sale, offered to the purchaser and the bank the amount of the price paid, with interest and all lawful costs and charges, which was rejected on the grounds that complainant had no right to redeem, and that redemption on part of the mortgagor must be in amount sufficient to cover, in addition to the mortgage, the full amount of the judgments, without credit for the money advanced on account thereof. Complainant's original bill, previously filed, had offered to redeem from all defendants' liens when ascertained according to law, and his amended bill offered to pay into court the amount tendered, or any sum which the court might determine to be proper, and to do whatever might appear equitable. *Held* that, under the circumstances, failure to make actual tender before filing the original bill did not necessarily defeat complainant's equity, and that the offer to do equity was sufficient.

4. SAME—STATUTE OF FRAUDS.
The payment and application of the money advanced by the mortgagor to the bank for purchase of the judgments being, as between them, a partial performance, the statute of frauds, even if otherwise applicable, could not be applied as against complainant exercising the right of the mortgagor.

Appeal from the Circuit Court of the United States for the Southern Division of the Northern District of Alabama.

This was a suit by Basil B. Gordon against William J. Smith, C. A. Johnston, the First National Bank of Columbus, Miss., R. T. Williams, and E. A. Quintard, to establish a lien on certain lands and to redeem the same.

On April 19, 1884, one E. W. Rucker conveyed to W. J. Smith, by general warranty deed, certain 840 acres of land, situated in Walker county, Ala., together with all the mines and mining rights,—the whole constituting the mining lands and property involved in this suit; and, upon the same day, Rucker took back from Smith a mortgage upon the same property to secure the sum of $2,725.55, to become due April 19, 1885, and represented by a promissory note payable at the Alabama National Bank, at Birmingham, Ala.; the same being one-half of the purchase money agreed to be paid by said Smith for said property. Said mortgage provided, among other things, that if the grantor should fail to pay the secured note at maturity the grantee, or his representative or assigns, might at once enter upon and take possession of the property, and proceed to sell the same at public outcry to the highest bidder for cash, after giving 20 days' notice of the time, place, and terms of such sale, with a brief description of said property, which notice

should be given by advertising the same in some newspaper published in Jefferson county, Ala., at least three times before the day of sale, and that at such sale the grantee, his representative or assigns, might buy said property, and have full power to make conveyance thereof to purchasers of the same. Before the maturity of the note and the law day of the mortgage, said E. W. Rucker assigned and transferred said note and mortgage to C. A. Johnston. On July 20, 1885, the said note being past due and unpaid, C. A. Johnston, as assignee, sold the said property on the premises, after a notice and advertisement of the same published in the Weekly Iron Age of July 2d and July 9th, and in the Daily Age from June 23d to July 5th (in all, 11 insertions), to R. T. Williams. and on July 23, 1885, executed and delivered to said Williams a deed reciting, in substance, the foregoing facts, which deed was duly recorded in Walker county on July 25, 1885. Johnston was the president and Williams was the cashier of the First National Bank of Columbus; and in taking and foreclosing said note and mortgage, and buying the property, they acted for and in the interest of said bank. Following the said sale, the bank put an agent in possession and general charge of the property, but contracted with Smith to operate the mines, as far as he could, for a stipulated rental. On March 25. 1885, one D. J. Gibson recovered a judgment against W. J. Smith in the circuit court of Walker county. Ala., for $3,708.46, and at the same term J. Pollock & Co., and other creditors of Gibson, recovered judgments against him for an aggregate amount about equal to his (Gibson's) judgment against Smith; and thereupon Gibson assigned and transferred his said judgment against Smith to his said creditors, in equal parts, to secure the said several judgments against him. Execution was issued upon the Gibson judgment, so that it operated as a lien on Smith's property in favor of Gibson's creditors, subject to the prior lien of the Rucker mortgage. On November 19, 1885, the First National Bank of Columbus recovered a judgment against W. J. Smith in the circuit court of Walker county, Ala., for the sum of $1,183.35, and $30.85 costs of suit, which judgment also became a lien upon Smith's property, but junior and subordinate to Gibson's. On the 25th day of September, 1885, William J. Smith, with several friends, representing a few shares, inaugurated proceedings in the state of West Virginia to charter a corporation by the name of Wolf Creek Coal Company, for the purpose of mining and shipping coal, and transacting a general merchandise business, which corporation was to keep its principal offices or places of business in New York, New Orleans, and Wolf Creek, in the county of Walker, state of Alabama. For the purpose of forming the said corporation, $500 were subscribed to the capital thereof, with the privilege of increasing the capital, by the sale of additional shares from time to time, to the sum of $100,000. The secretary of state for West Virginia certified and declared that the corporators named, and their successors and assigns, should be a corporation until the 1st day of September, 1935. On the 26th day of September, 1885, the Wolf Creek Coal Company, represented by William J. Smith, president, and William P. Smith, secretary, executed a first mortgage upon the 840 acres of land herein referred to as Smith's property, and also all the machinery, miners' houses, buildings, railroad cars, and other plant in use for working the mine on said premises, to E. A. Quinard, trustee, to secure an issue of 50 bonds, of $1,000 each, to be issued by said Wolf Creek Coal Company, to be due in 10 years, with interest at the rate of 8 per centum per annum, payable semi-annually. Said mortgage was filed for record in the proper office of Walker county, state of Alabama, on the 21st day of November, 1885, and was duly recorded January 6, 1886. Armed with his West Virginia charter for the Wolf Creek Coal Company, and an issue of $50,000 of bonds of said company, secured by mortgage as aforesaid, Smith undertook to raise money to redeem his land, and organize and operate the mining properties, at the north. Meeting Mr. Basil B. Gordon, a citizen of Virginia, he made such representations, in personal interviews and by letters, to him, that he obtained from Gordon a loan of $5,000, secured by a pledge, as collateral, of the $50,000 bond issue of the Wolf Creek Coal Company. The representations made to Gordon as to the security given are fully shown by letters, of which the following are copies:

"Baltimore, July 10th, 1886.

"Basil B. Gordon, Esq., Front Royal, Va.—Dear Sir: For the purpose of fully securing you for the loan of $5,000.00 on my property, I am willing to give you the fifty bonds of the Wolf Creek Coal Co., of $1,000 each,—$50,000 in all. Said bonds are secured by a first mortgage on my 840 acres of coal land, and on all the plant. E. A. Quintard, president of the Citizens' Savings Bank, corner Bowery and Canal street, New York City, is trustee under the mortgage. Said mortgage is duly recorded at Jasper, Walker county, Ala., as well as the deed for the 840 acres purchased from Gen. L. E. W. Rucker, of the Alabama State Bank, at Birmingham. I have a copy of the mortgage and deed now in my possession. The deed to my coal land is perfect and clear title, as well as the first mortgage under the bonds, the whole issue being for $50,000. My object in making you this proposition was that the bonds have cost me, as well as the mortgage has cost me, considerable money, and after you have loaned me the $5,000 and you should decide not to take a one-third interest with me, I would then negotiate these bonds, and secure the money on them, and pay you your $5,000, with 8 per cent. per annum interest. I will leave it to you, after you lend me the money, to decide, one way or the other, when you will take the interest I offered on the terms I submitted to you in writing. I think that this is the best plan for both of us, and you can draw up an agreement in regard to taking an interest in my property on the terms I submitted. Gen. L. E. W. Rucker will guaranty the deed to my property by accepting this proposition. All that remains due on it will be what I owe the First National Bank of Columbus, Miss. What little I owe outside of the bank I will settle with out of the $5,000 you loan me, which will leave enough for me to start and operate my mine. Not knowing when you would return to the city, I concluded to write you on the subject. I would be pleased to receive an early reply. Hoping that you are well, and enjoying yourself on your farm, I am,

"Truly yours,                                          'W. J. Smith.

"P. S. Address 134 Boundary avenue, near John street, Baltimore, Md.

"[Indorsed] Eight hundred and forty acres on main line Georgia Pacific, Walker county, Ala., purchased April 19th, 1884, from Gen. E. W. Rucker."

"Baltimore, August 2nd, 1886.

"Basil B. Gordon, Esq., Sandy, Va.—Dear Sir: Your favor, 30th, at hand this morning. I visited Messrs. Brown & Lowndes' office, and examined the abstract of title of my property furnished you by Messrs. Garrett and Underwood, which is very clear and explicit in all of its details, as far as they went. The court at Jasper was destroyed by fire in 1884, and May, 1886, by which all of the records of Walker county, Alabama, was destroyed by fire. Then Gen. E. W. Rucker went to the chancery court, and had the said court give him a title for all the lands that Thos. Petus purchased from the owners with Gen. E. W. Rucker's money, embracing the 840 acres that I purchased from E. W. Rucker, which makes my title perfect. And besides this, Gen'l Rucker will guaranty my title himself, and give it to me in writing whenever I call on him for it. As he is responsible, and is worth $100,000, in addition to this I will be responsible myself, so far as the title is concerned; and my improvements are worth to-day, at the mines, $10,000, outside of the land. I would consider it a personal favor if you would please loan me the $3,000 on my bonds on the terms I proposed, and you will find that I will carry out all my promises; and, if you do not care to take an interest in my property, I will return you the $5,000 in January, 1887, with interest, as I learned from a friend that I can raise the money on my property in Memphis, Tenn. I can do this when I have my mines fully under way, and shipping 100 tons of coal daily. On receipt of this, will you please wire me, care of Brown & Lowndes, if you will let me have the $5,000 on my bonds, either as temporary loan, or on the terms I proposed, as I am very anxious to start my mines at once, to take advantage of the fall trade, which will be very active. If you will grant me this favor, I will stop at Birmingham, and get Gen'l E. W. Rucker to guaranty the title to the property, and will assign it to you, in addition to the bonds. Those little defects in the chain of title are obliterated by being destroyed by fire, and are wiped out

by the title given to Rucker by the chancery court, and will never bother me in the future. This man, Thos. Petus, died very suddenly, and was insolvent at the time of his death. Rucker furnished him the money to purchase some 30,000 acres of coal land in Walker and Jefferson county, Alabama; and to secure Rucker he made a will, and appointed E. W. Rucker his executor, to settle up his estate, as well as to secure him for the money he advanced to purchase these mineral lands, and Rucker is now acting in that capacity now, and is selling off those coal lands at an advanced price, by which will make over $200,000 when he sells all of the 30,000 acres. Said lands he is selling from $15 to $25 per acre, which are from two to five miles from the railroad. Hoping that you will comply with my request, I am,

"Yours, truly, W. J. Smith.

"P. S. My bonds are still in the possession of Brown & Lowndes."

"Baltimore, August 2nd, 1886.

"Basil B. Gordon, Esq., Sandy, Va.—Dear Sir: Since writing you this morning, I send you a copy of the deed of the 840 acres from E. W. Rucker to W. J. Smith, in which he defends me in the title, making the title perfect against all claimants. You can judge from the perusal of the same that it is correct and binding, and leaves no room for any doubt. I would suggest to you to write to E. W. Rucker, Birmingham. He will verify all I have stated. Please return this copy of deed.

"Truly yours, W. J. Smith."

The $5,000 advanced by Gordon on the representations of Smith were paid in sums as follows: $2,500 on the 4th day of August, 1886; $2,000 on the 8th day of September, 1886; $250 on the 16th day of November, 1886; $250 on the 20th day of November, 1886. The money was paid in drafts, a large portion of which was collected by the First National Bank of Columus, which bank, through its agents, was informed of the source and purpose for which Smith obtained the money. The most of the money passing through the bank was applied to the operation of the mining property, but $1,000 of it, by agreement between Smith and the bank, was applied to the purchase of the judgments against Gibson, which were to be used in offsetting the judgment in favor of Gibson against Smith, to facilitate the redemption of the land by Smith from the sale under the Rucker mortgage in case Smith should be able to redeem within the two years allowed by the statute, which it was hoped and expected he would be able to do.

On the 31st day of December, 1886, C. A. Johnston, president of the First National Bank of Columbus, sent the following letter:

"First National Bank, Columbus, Miss., Dec. 31st, 1886.

"Mr. Basil B. Gordon, 14 E. Franklin Street, Balto., Md.—Dear Sir: Mr. W. J. Smith, formerly of Baltimore, has a coal mine on the Georgia Pacific Railroad, some 70 miles from this place. In July, 1885, it was sold under a mortgage, and one Mr. Williams bought it. I bought a judgment against Mr. Smith, which was obtained about the time of the mortgage sale. Under the laws of Alabama, he has two years in which to redeem this property from the above liens. That time will expire in July, 1887, and the title will be vested absolutely as above stated. He is working the mines under our permission, though we are in possession, but his means are limited; that is, he is actually living from hand to mouth, and cannot make any money. I understand you have advanced him some. Now, I suggest that for your security, and the proper working of the mines, it would be to your interest to pay us off, and take possession of the property. Mr. Smith is doing the best he can, under the circumstances, but he can do almost nothing with such meager means.

"Yours, very truly, C. A. Johnston."

—And on the 14th of January, 1887, also forwarded the following letter:

"Birmingham, Ala., January 14th, 1887.

"Mr. Basil B. Gordon, 14 E. Franklin Street, Balto., Md.—Dear Sir: Your favor, 4th inst., was forwarded here from Columbus, Miss. I may be in

Baltimore in course of the next ten days, and, if so, will try to call on you, to talk over Mr. Smith's affairs. We bought the property at mortgage sale in July, 1885, and own a judgment against him for some $3,500.00, and another for some $1,200.00. Under the laws of this state, he has until July of this year in which to redeem property. After that time, our title is good. We do not want the property without his full and free consent, but do want our money, and can hardly wait any longer after his right ceases. Your Wolf Creek Company mortgage is subsequent to all above.

"Yours, very truly, C. A. Johnston."

These two letters not sufficiently explaining the situation to Mr. Gordon, Mr. Johnston, on the 27th of January, 1887, wrote the following letter:

"Columbus, Miss., January 27, 1887.

"Mr. Basil B. Gordon, 14 E. Franklin St., Baltimore, Md.—Dear Sir: I was not able to stop in Baltimore on my recent trip to New York, as I hoped. I now find your favor of the 12th inst., and in reply will give you the general facts, without going into details. When Mr. Smith bought this land of Gen. Rucker, he paid part cash, and gave a mortgage for the unpaid balance. I bought this, and foreclosed it in July, 1885; Mr. R. T. Williams buying the property for about the amount due me. A short time previously, a Mr. Gibson got judgments against Mr. Smith for something over $3,000.00, and levied on this property, and sold and took possession of, and away, some of the machinery. Mr. Smith owed this bank some $1,200.00, with interest, upon which we sued, and got judgments, but junior to the Gibson judgments. Within the past year, I bought the Gibson judgment against Smith. So that now our Mr. Williams owns the whole property under a foreclosure deed subject to the rights of redemption by me, as owner of the Gibson judgment, and all subject to the right of redemption by this bank as the junior judgment's creditors. I am advised that under the laws of Alabama the fee-simple title will rest on Mr. Williams, under his mortgage deed, if he is not redeemed out at the expiration of two years from its date, to wit, in July, 1887. I understand that the mortgage under which the bonds that you hold, was made subsequent to the deed to Mr. Williams and the judgments referred to above. If this is the case,—and it undoubtedly is, as to the deed,— you will have no security after July, 1887. Knowing your situation, I deemed it advisable to open this correspondence with you, and suggest that you will have to pay off existing liens before you have any security.

"Yours, very truly, C. A. Johnston."

July 8, 1887, Gordon brought his bill in the circuit court against William J. Smith, C. A. Johnston, the First National Bank of Columbus, Miss., R. T. Williams, and E. A. Quintard, of New York City, in which, after alleging many of the foregoing facts, he averred, charged, and prayed as follows:

"And your orator further avers that, after obtaining the various sums of money from him as aforementioned, said Smith did in fact pay said money, or a large amount thereof, to the said bank in Columbus, on account of and in redemption of the said Rucker mortgage debt, then held nominally by the said R. T. Williams, and particularly that one payment of two thousand dollars made by your orator (that of the 8th day of September, 1886) was paid by your orator to said Williams, the cashier of said bank, on account of said Smith, which in itself went far towards the redemption of said mortgage claim held by said Williams for said bank, as the law, under the circumstances before mentioned, would certainly apply it; and, out of the balance of the $5,000 advanced by your orator to said Smith, enough more money was paid to said bank by said Smith to completely redeem and extinguish the claim upon the said property due under the Rucker mortgage, and enough money further to purchase and secure from the parties holding the same the judgment obtained against said Smith by said D. J. Gibson, for your orator further alleges that said D. J. Gibson had previously assigned the judgment held by him against said Smith, in certain proportions, to certain creditors of his (said Gibson, namely); that said Gibson assigned to Rankin & Co., who had a judgment against said Gibson, of date March 25, 1885, for $1,616.35,—an equal amount of the judgment held by him, said

Gibson, against Smith; and that said Gibson assigned to J. Pollock & Co., who held a judgment against said Gibson, of date March 25, 1885, for eleven hundred and sixty dollars and twenty-five cents, an equal amount of the judgment obtained by him, said Gibson, against said Smith, and said Gibson assigned to Buckner & Co., who held a judgment against said Gibson, dated March 25, 1885, an equal amount of said judgment held by him, said Gibson, against said Smith; and that said Smith, through C. A. Johnston, with part of the money obtained from your orator as aforesaid, purchased, with the consent of said Gibson, the judgment claims of Rankin & Co. and J. Pollock & Co. against said Gibson, thereby extinguishing the judgment obtained by said Gibson against said Smith to the extent and amount of said last two judgments, though the assignment from said Rankin & Co. and said J. Pollock & Co. of their rights against said Gibson and said Smith was secured in the name of said C. A. Johnston, but in reality are owned by said Smith, and, in view of the facts and circumstances before stated, ought to be treated as the property of your orator, and entered to your orator's use, or canceled as against your orator. And your orator further alleges that, out of the money obtained as aforesaid from your orator, said Smith purchased fifteen new pit wagons, and other machinery and equipments of said mine, which are now upon the said property, and that said Smith, also out of said money furnished by your orator, paid his operatives and operated said mine from August, 1886, to January, 1887, since which time he has been operating said mine, but the machinery and property are lying neglected and idle, and depreciating in value, and without proper precautions for preservation and protection for the benefit of your orator, or of any other parties interested in the said property. And your orator further charges that while said mine is now actually, and always (at least, since August, 1886) has been, in the possession of said Smith, yet said C. A. Johnston claims that the possession of said Smith is constructively said Johnston's possession, though said Johnston has in reality no right to the possession whatever; and, as before recited, said Johnston threatened to occupy and appropriate all of said property mentioned in said mortgage (Exhibit No. 1), to the total and final exclusion of your orator, and the deprivation of your orator of all the security in the property, both real and personal, to which your orator is entitled, as above set out. And particularly said Johnston claims, and has notified your orator, that after the 20th day of July in the year 1887 said Johnston shall consider and so use and treat said property as if your orator's rights in the premises were forever lost and forfeited, and will not allow your orator the opportunity of redeeming such prior liens as may be determined to be lawfully existent upon said property, and which your orator is willing to redeem, and hereafter, more particularly and formally, offers to redeem. And, further, your orator charges that said Smith is absolutely and altogether insolvent, as is also the said Wolf Creek Coal Company, and that unless said property, real and personal, is put into proper care and custody until the same can be sold, for the interest of the parties herein, to advantage, it will be insufficient to discharge the claim of your orator, even though your orator's claim constitutes a first lien on the property, prior to all others. And your orator further avers that if the whole claim of the said First National Bank of Columbus, or whatsoever other person held the claim against the mortgaged property represented by the Rucker mortgage, were not discharged by the money obtained of your orator by Smith as aforesaid, or if any lien prior to the date of the mortgage from the Wolf Creek Coal Company to said Quintard exists, unpaid and undischarged, against said property, and superior to your orator's rights to the same, your orator is able and willing, and hereby offers, to discharge and redeem the same when the same shall have been truly and justly ascertained and established according to law. And your orator is advised that said defendant Smith, and all claiming under or by him, are estopped from disputing, or taking advantage of the absence of the record of, the deed from said Smith to said Wolf Creek Coal Company for the property herein referred to (being the same mentioned in Exhibit No. 1), by reason of the representation of said Smith to your orator and others, and your orator's action upon said representation, and that said Smith will be required by this court to record, or to re-execute and record,

said missing deed (referred to in said Exhibit No. 1) from said Smith to said Wolf Creek Coal Company, nunc pro tunc, and that your orator, by reason of the facts hereinbefore mentioned, is entitled to a first lien, free of all incumbrances, upon the property mentioned in Exhibit 1, and all personal property upon or about said mine, acquired since the date of said exhibit, to wit, September 26, 1885; and your orator is entitled to have his said lien executed upon said property, and extended for the amount of your orator's advances to said Smith, by the proper process of this court,—the said coupon bond being three coupons in arrears and unpaid, and your orator's loan being overdue by its terms,—and that pending the final decision of this court upon the claim of your orator, and upon all disputed matters in this suit, and the final adjudication of all controversies herein suggested, that this court, according to its course and custom for the protection of the interests of your orator and all parties concerned in this controversy, will appoint its receiver to take possession of all the property—real, personal, and of any kind whatsoever—in these proceedings mentioned, and to hold and care for the same, under the direction of this court, until the further order of this court in the premises, an order to which effect is hereby particularly prayed. And your orator is also advised and specially prays that this court will issue its writ of injunction, directed to the said First National Bank of Columbus and the said C. A. Johnston and R. T. Williams and the said W. J. Smith, forever prohibiting them, or any of them, from treating as their own, converting to their own use, selling, transferring, or assigning, or otherwise disposing of, any of the property in these proceedings mentioned, or any interest or title claimed or held by them, or any of them, in the said property, until the final adjudication of all rights involved in these proceedings, or the further order and judgment of this court. And your orator further alleges that he hath heretofore, prior to the filing of this bill of complaint, requested the said E. A. Quintard, the trustee mentioned in said mortgage (Exhibit No. 1), to proceed to execute the trust imposed upon him by said mortgage in accordance with its terms, applicable to the facts and circumstances hereinbefore referred to, but said Quintard hath in effect refused and neglected so to do. To the end, therefore, that this court will pass an order appointing its receiver for the property herein referred to, as hereinbefore specially set out and prayed, and will further issue its writ of injunction, enjoining and prohibiting the said First National Bank of Columbus, the said C. A. Johnston, the said R. T. Williams, and the said W. J. Smith from converting to their use, removing, assigning, concealing, or otherwise disposing of, any part, interest, or claim in the property herein referred to, as above specially set out and prayed, and will further require the defendants hereinafter named to make full discovery of all the matters and facts herein charged against them, and to account fully to and with your orator for all moneys or other securities received by them, or any of them, directly or indirectly, of your orator, and to fully set out, discover, and prove all claims for money or property, of any kind whatsoever, held or claimed by them, or any of them, against your orator, or against the property and security herein claimed by your orator, so that your orator may have full opportunity for redeeming the same, and that this court will fully investigate, hear, and determine the accounts and disputes, claims and counterclaims, between your orator and said defendants, and will further pass a decree establishing and allowing your orator's claim, as herein set out, to be a first lien, for the full amount thereof, on the property herein mentioned, and ordering the same to be sold to satisfy your orator's claim, and the claim of all parties to this suit, in their proper order."

After vainly demurring to Gordon's bill, the First National Bank of Columbus, C. A. Johnston, and R. T. Williams answered the bill under oath, separately, but substantially to the same effect, reciting many of the facts as claimed by the complainant, confessing and avoiding other matters about which there was practically no dispute, and otherwise as follows:

"Answering paragraph fifth of said bill, respondents deny that said Smith paid said money, obtained by him from said Gordon as aforesaid, or any part thereof, to said bank, or to any one else for it, on account of and in redemption of said Rucker mortgage debt. Nor was said two thousand dollars, obtained as aforesaid by said Smith's order, on the 8th day of September, 1886,

or any part therof, paid on account of said Smith for the extinguishment of said mortgage debt, or the redemption of said mortgage claim, as alleged in said bill. Respondents deny that said two thousand dollars ought, by law, to be applied to said Rucker mortgage, as insisted in said bill, for reasons which will hereafter more fully appear. Respondents further deny that enough or any part of said five thousand dollars was paid to said bank, directly or indirectly, in redemption and extinguishment of said Rucker mortgage debt, as alleged in said bill; and they further deny that any part of said five thousand dollars (except the sum of one thousand dollars, as hereinafter more fully explained) was used by said bank, or either of these respondents, to purchase the judgments held by said D. J. Gibson against said Smith. Respondents admit that said Gibson, in order to secure certain judgments held against him by Rankin & Co., J. Pollock & Co., and Buckner & Co., as alleged in said bill, did on the 25th day of March, 1885, transfer his said judgment of $3,708.46, which he held against said Smith in certain proportions mentioned in bill, to his aforesaid judgment creditors, which more fully appears from a copy of said security herewith filed as Exhibit F of this answer, which respondents pray may be taken and considered as part thereof. Respondents admit that a part of said money obtained from said Gordon, to wit, the sum of one thousand dollars, was used by said Johnston to purchase the entire judgment of said Buckner & Co. and part of the judgment of said Rankin & Co. against said Daniel J. Gibson, as alleged in said bill, not with any knowledge or information or notice whatever, at the time said $1,000 was obtained by said Johnston for said purpose, that said Gordon furnished the same to said Smith. Further answering said fifth paragraph, and in full explanation of the entire dealings and transactions between said bank and said Smith, respondents aver and state the truth to be as follows, to wit: Said Smith, having opened a coal mine in Walker county, Ala., upon the property involved in this controversy, in the year 1884, opened an account with said First National Bank of Columbus, Miss., and transacted his business through said bank. Soon afterwards he borrowed one thousand dollars from said bank, giving his notes therefor. He failed to pay said notes at maturity, whereupon said bank brought suit and obtained judgment against him in the circuit court of Walker county, Ala., on the 19th day of November, 1885, for eleven hundred and eighty-five and 35-100 dollars, besides thirty and 35-100 dollars costs,—in all, $1,219.20. Previous to obtaining said judgment, however, the said Daniel J. Gibson had obtained his said judgment against said Smith in said circuit court of Walker county for the sum of $3,708.46, so that the bank's said judgment was junior to said Gibson's. The said bank having learned in the meantime that said Smith was still indebted to E. W. Rucker in the sum of $2,725.33, balance of purchase money on said lands, as aforesaid, the said bank, in order to better its condition with reference to its said judgment against Smith, under advice of counsel, purchased a Rucker mortgage and note as aforesaid, giving full value therefor, thereby securing to itself a first lien upon the property. In due time the Rucker mortgage was foreclosed as hereinbefore stated and fully explained, and said property was purchased and taken charge of for the benefit of said bank as aforesaid. Said Smith was thereby thrown out of employment, and left without means. His hope was to redeem the property in the two years allowed him by law. He placed an exaggerated value upon the premises, and never seemed to doubt his ability to raise the money necessary to pay all indebtedness, and become the owner of the property again. The bank was hopeful that he would be able to do so; having no desire to own the property, but only wishing to get back what money it had expended on said property as aforesaid. Having the property thus in possession, the bank deemed it advisable to keep the mines open; thinking that there might be some profit in carrying on the business, and at the same time have the property suitably cared for, and the mines protected from damage by flooding. Said Smith being out of employment, and competent to superintend the working of the mines, the bank put him in charge of said mines, employed miners, and worked the mines about one and a half months, when, finding there was no profit to it in said business, the hands were discharged, and the mines were put in charge of a watchman to look after the property and drain it. Several months after this, to wit,

about the 16th day of August, 1886, said Smith came to the bank, and stated to Mr. Williams, the cashier, that he had some money, and wanted to lease the mines. Said Williams tried to induce him to pay the money into the bank, as in part redemption of said property. Smith declined, and, after talking for some time over the propositions, he and said Williams agreed that he might go to the mines, and work them as the lessee of the bank, and pay rents in sums of $500 and upwards, but that the bank's watchman should remain in charge and legal control and possession of the property, so that the bank might be able to dispossess the said Smith at any time, in case it should see fit to do so. Said Smith then opened an account with said bank under the style of 'W. J. Smith, President,' and deposited to his credit the sum of $1,350 in cash on August 16, 1886. Subsequently, to wit, about the 10th September, 1886, said Smith came into the bank, and said that he had authority to draw on Brown & Lowndes, of Baltimore, Maryland, for the sum of $2,000, which money he proposed to use in the same way. Said Williams took his draft for collection, and when he got the return for it, on the 15th of September, 1886, he gave W. J. Smith, president, order for the proceeds of said draft, to wit, $1,998; said Smith again refusing to pay this money to the bank as in redemption, in part, of said property, but he put it into said bank to his credit as president, as capital in operating said mines. Subsequently, however, said C. A. Johnston induced said Smith to turn over to the bank one thousand dollars in cash, to be used partly in purchase of the judgments against said Daniel J. Gibson, held by J. Pollock & Co., Rankin & Co., and Buckner & Co., as aforesaid; the bank being advised that said judgments, secured as they were by a lien on said Gibson's judgment against Smith of $3,708.46 as aforesaid, created an incumbrance on said property prior to the bank's said judgment of $1,219.20 against said Smith, which would entitle said judgment creditors of Gibson to come in and redeem said property within two years from said foreclosure, to the exclusion of the bank, or which might put the bank to a disadvantage in redeeming said property, and which, therefore, the bank desired to remove. The bank was also advised that by purchasing said judgment there would be less complication and difficulty attending the redemption proceeding stated in paragraph 12 of this answer; and thereupon the said Johnston did purchase said judgments against said Gibson, using one thousand dollars of Smith's money, deposited as aforesaid, in the purchase thereof, as hereinbefore explained (all of which will appear from Exhibits G, H, I, and J, which are the assignments of said judgment, filed with this answer), and prayed to be considered as a part of the same, and they were to be held for the use of said bank, by said Johnston, with the understanding and agreement, however, with said Smith, that he was to have credit for said $1,000 when he came to redeem the said property within the two years allowed him by law, which he fully expected he would be able to do. The bank was also advised and was anxious to fasten its said judgment of $1,219.20 against Smith, as a lien upon said property, within the two years allowed by the laws of the state of Alabama for the redemption by judgment creditors of the property sold under mortgage. Hence, on the 1st day of July, 1887, the bank assigned its said judgment to C. A. Johnston, in order that he might redeem said property in the interest of said bank, which he afterwards did, as will be particularly explained in paragraph XII of this answer. Said assignment to Johnston by the bank is herewith filed, as Exhibit K hereof, and prayed to be taken as a part of the same, but said assignment to C. A. Johnston, without his paying anything to the bank, to be held by him for the use and benefit of the bank. * * * Respondents aver that they and said bank knew nothing of Smith's transactions with Gordon, and never heard of it until after he had exhausted his deposits in said bank in the manner above explained. Nor did they know of the existence of said Quintard's deed of trust, nor of said Smith's alleged deed to the Wolf Creek Coal Company, until long after said transactions with Smith were ended. And respondents aver and charge that said Smith was never entitled, by statute or otherwise, to redeem said property from them; that the right of redemption secured to him at one time by statute was entirely lost when he conveyed his right, title, and interest in said property to said Wolf Creek Coal Company, in so far as said Smith was concerned, and that

any dealings or transactions between these respondents and said Smith, by which they aided or attempted to aid his alleged redemption of said property, were absolutely ex gratia on the part of respondents,—not forced upon them by law, but merely a favor extended; and that although they might have allowed said Smith to have redeemed said property, had he have repaid to them the lawful charges, yet the said Smith did not at any time redeem said property, nor did he pay any part of the lawful charges thereon, nor is he nor the said complainant entitled at this time to a reconveyance of the same, except by such contract as one citizen may make with another. In fact, as soon as respondents learned that the said Gordon had advanced money to said Smith with a view of looking to said property for security, said Johnston hastened to inform said Gordon of his claims upon said property, and of said Smith's hopeless condition, financially, to make good his promises and obligations, so that Gordon might proceed in due time to take such steps as would secure to him a lien on said property that would protect him against loss. Hence, said letters from Johnston to Gordon, exhibited with complainant's bill, were to inform him of the liens and incumbrances he would have to pay off before he could hold said property as his security, for at that time Smith had almost, if not entirely, exhausted his resources."

The answer further admitted the insolvency of Smith and the alleged Wolf Creek Coal Company. In addition, the said answer showed that Daniel J. Gibson, on the 14th day of July, 1887, after the filing of the bill, but claiming without notice thereof, redeemed the lands in controversy to the said bank, through R. T. Williams, who held legal title thereof, and that on the 15th day of July said bank, through its agent, C. A. Johnston, who held the legal title in the interest of said bank, redeemed said property from said Gibson, as provided by the laws of the state of Alabama, from which deed of redemption it appears that, in consideration of said Johnston purchasing and canceling said several judgments in favor of Pollock & Co. and others against said Daniel J. Gibson, he transferred and duly assigned his said judgment against said Smith, of $3,708.46, to said C. A. Johnston, $1,000 of which was held to the credit of said Smith if he had come to redeem said property before the 20th day of July, 1887, by offering to pay said Rucker mortgage debt and said Gibson judgment, with interest and lawful charges.

Smith answered the bill, giving a history of the facts in the case as he believed them to be; admitting the purchase from and the mortgage to Rucker, and a foreclosure of said mortgage, the purchase of the property by the bank, which entered in possession through an agent; admitting also the Gibson judgment, the organization of the Wolf Creek Coal Company, the making a deed of the property to said Wolf Creek Coal Company, the issuance of 50 bonds, of $1,000 each, by the Wolf Creek Coal Company, and the granting of a mortgage to secure the same, the negotiations with and the loan from Gordon, substantially as alleged in the bill,—and specifically averred as follows: "Respondent visited Columbus, Mississippi, on his way to Alabama, and called on C. A. Johnston, who held said mines for the bank as aforesaid, to make arrangements for opening up said mines again, but he was not willing to allow respondent to begin operations until the said Gibson judgment was removed. Respondent informed Mr. Johnston that he had contracted to sell Mr. Gordon one-third interest in said property for $20,000, to be paid when the title was perfected, and that he had already advanced to him $2,500 of the money, and that he wanted to begin mining operations with that, and put it in bank to his credit as president of the Wolf Creek Coal Company, and that, with the other money he was to receive from Gordon, he proposed to pay off and discharge all incumbrances. Respondent then wrote again from Columbus, Mississippi, asking him for $2,500 more to pay off the D. J. Gibson, judgment. He wired respondent, at Columbus, in answer to said request, to draw on him, through Brown & Lowndes, for two thousand dollars, which he did; placing the check in the bank for collection, and ordering the proceeds to his credit as president. A few days after drawing said check, and placing the same in bank for collection, the bank informed respondent that it had been paid, and the proceeds, $1,998.00, had been placed to his credit as directed; and respondent gave C. A. Johnston, the president of the bank, a check for one thousand dollars, with which to purchase at a discount, such as said Johnston

could negotiate, certain outstanding judgments against D. J. Gibson, with which to offset said Gibson's judgment against respondent, and said Johnston used said $1,000 accordingly." And he averred other facts not necessary to recite.

Replications were filed to all the answers on the 22d of March, 1889. October 1, 1890, by leave of the court, the complainant amended his bill, alleging irregularities in the foreclosure of the Rucker mortgage, and that the sale thereunder was voidable because of inadequacy of consideration, and because the bank had purchased it at its own sale, and further alleging that on the 15th day of July, 1887, within the period of two years from the sale under the Rucker mortgage, the complainant, by his authorized agent, tendered to the First National Bank of Columbus, Miss., and then and there offered to pay to the said bank and R. T. Williams, in gold coin of the United States of America, $4,000, and, in addition thereto, all lawful costs and charges, of any sort whatsoever, paid by said Williams and said bank on said lands, and that the said Williams thereupon refused to accept said tender for himself or for said bank, or any tender less than $8,500 in amount, and "orator now offers to pay in court, for the benefit of the real owner of the Rucker mortgage, the amount bid at said foreclosure sale, with all proper interest, liens, and other charges that are right and proper for orator to pay, in order that said sale may be set aside and vacated as soon as the same may be ascertained;" and otherwise, and in all respects, orator offered to do and perform equity and right in the premises. The defendants filed their demurrers to the complainant's bill, as amended, which demurrers, having been argued and duly considered by the court, were overruled; and thereupon the defendants the First National Bank of Columbus, Miss., and C. A. Johnston and R. T. Williams, refiled their answers as amended, and the complainant refiled the general replication. The cause, as to Rucker, was dismissed by stipulation. On the hearing the court dismissed the complainant's bill, with costs, and complainant, Gordon, appealed.

A. H. Taylor, for appellant.
James E. Webb, for appellee.

Before PARDEE and McCORMICK, Circuit Judges, and LOCKE, District Judge.

PARDEE, Circuit Judge, after stating the facts, delivered the opinion of the court.

The conceded facts of this case require that, as between Smith and Gordon, the latter's title to the land in controversy, as deeded by the Wolf Creek Coal Company, the validity of the mortgage made by the Wolf Creek Coal Company to secure the issue of $50,000 of bonds, and Gordon's rights, as pledgee of such bonds, to a good title to the land in controversy, if Smith can give it, shall be recognized. Now, when we consider that in fact Smith had nothing to convey, nothing to pledge, but an interest in the property subject to mortgage rights and outstanding judgments, there is no question that, in equity, Smith is estopped from setting up any of these things as a reason why he should not make good his representations and promises; and it is clear that if he has or had any control over or interest in these outstanding incumbrances, or if he subsequently acquired any other or further interest in the property, he is compelled, as a matter of equity, to use his rights for the benefit of his covenantee, Gordon. The specific performance to which Gordon is entitled, as against Smith, is not necessarily barred by the intervention of the rights and claims of the First

National Bank of Columbus. Such a bar exists only if it is impossible for these rights and claims to be divested on equitable terms. See Breitling's Adm'r v. Clarke, 49 Ala. 450; Moore v. Crawford, 130 U. S. 132, 9 Sup. Ct. 447. If Gordon has the right to a specific performance against Smith, then, considering Smith's representations, his present insolvency, and his neglect and refusal to act, it seems clear that Gordon is so far subrogated to the rights of Smith, including the rights that Smith ought to acquire and secure for his benefit, that Gordon may himself, in a court of equity, assert and compel such rights, at least to the extent that such rights are transferable. Now, at the time Smith, on representations of perfect title to the property in controversy, obtained Gordon's money, he (Smith) had the statutory right to redeem the property sold under the power in the Rucker mortgage, and this right to redeem fully existed at the time the bill was filed in the cause. The case further shows that, prior to the loan obtained by Smith from Gordon, negotiations were pending between Smith and the agents of the bank, looking to the redemption of the property by Smith from the sale under the Rucker mortgage, as well as under the judgments in favor of the bank and in favor of Gibson, and that after the loan was obtained from Gordon such negotiations were partially carried into effect by the appropriation of $1,000 of the money obtained by Smith from Gordon to the purchase by the agents of the bank of the Pollock & Co. and other judgments against Gibson, with the acknowledged intent and purpose of offsetting the same against the judgment obtained by Gibson against Smith, and thereby reducing the amount which Smith would have to pay in order to obtain a clear title. It is true that the bank and its agents, in their sworn answers, deny that they at that time knew that the moneys which Smith, through the bank, was collecting from Gordon, were moneys obtained from Gordon; but the circumstances of the case, in connection with the sworn answer of Smith, are very strong to charge the bank with such notice. Be this as it may, the bank acknowledged to have received the $1,000 from Smith for the purpose of acquiring the judgments against Gibson in the interest of Smith's redemption of the property. On no other theory than that there was a contract between Smith and the bank that Smith should be allowed to redeem the property can the payment and appropriation of the $1,000 be accounted for. It is true that the bank claims that the redemption contemplated on the part of Smith, which was to be facilitated by the purchase of the judgment against Gibson, was the strict redemption provided for by the statute, and that thereby Smith acquired no greater right than the right given him by the statute; but in our opinion, if there was a contract between Smith and the bank that Smith should be allowed to redeem, and the bank accepted part of the redemption money, leaving the balance to be thereafter paid, Smith's right to redeem thereafter was founded upon contract right, as well as upon the statutory right. There may be some question whether Gordon, as the equitable assignee of Smith, in the absence of other equities, could be

let in to exercise Smith's statutory right of redemption. In Paulling v. Meade, 23 Ala. 505, it was said:

"That the judgment debtor has the right to sell his equity of redemption cannot be questioned; and, when sold, the purchaser becomes substituted to all the rights and remedies which the statute confers on the debtor himself, and is subjected to the duties which by law devolve on his vendor."

So, in Bailey v. Timberlake, 74 Ala. 225, 226, the right of the assignee of the equity of redemption under the statute was recognized. In Powers v. Andrews, 84 Ala. 289, 4 South. 263 (a case decided since the institution of the present suit), Bailey v. Timberlake, supra, was overruled by a divided court: and it was decided that the statutory right of redemption is confined to the persons upon whom it is expressly conferred, and it is not conferred upon a junior mortgagee, or assignee of the equity of redemption. Following the decisions of Powers v. Andrews, February 27, 1889, the redemption statute was amended so as to read as follows:

"Where real estate or any interest therein is sold under execution, or by virtue of any decree in chancery, or under any deed of trust or power of sale in a mortgage, the same may be redeemed by the debtor, his vendee, junior mortgagee or assignee of the equity of redemption from the purchaser or his vendee within two years thereafter; in the manner following," etc.

The supreme court of the United States has said that the construction of a state statute given by the highest court of a state is a part thereof, and, when a contract has been made under protection of it, it will not allow a change of construction by a state court to impair the rights of the parties under it, any more than it would allow an act of the legislature to have such effect. Douglass v. County of Pike, 101 U. S. 677; Clark v. Bever, 139 U. S. 117, 11 Sup. Ct. 468. We do not, however, find it necessary, in this case, to determine exactly whether Gordon, as the equitable assignee of Smith, had a right to exercise Smith's right of redemption under the statute; for we are of the opinion that, as between the parties to this case, and growing out of their dealings and conduct, Smith's right to redeem was taken out from under the statute, and founded upon a contract, the specific performance of which can be enforced by Smith, and should be enforced in favor of Gordon, as the equitable assignee of Smith. See Butts v. Broughton, 72 Ala. 294; Anthe v. Heide, 85 Ala. 236, 4 South. 380; Bates v. Kelly, 80 Ala. 142; Moore v. Crawford, 130 U. S. 122, 9 Sup. Ct. 447.

The defenses urged in this case merit examination.

It is urged that Gordon does not occupy the position of a bona fide purchaser, because he was advised by the letters of Smith to him, and particularly by the letters of July 7 and 10, 1886, of the bank's claim upon the property. There is no doubt, under the evidence in this case, that Gordon showed little of the shrewdness and caution of the ordinary money lender, and that by the letters in question he was advised of circumstances which should have put him on inquiry. At the same time the evidence impresses us that Gordon, in advancing the money which he did to Smith, believed Smith's verbal repre-

sentations, and that he was getting a good title. In the original aspect of Gordon's bill, wherein he seeks, not only the right to redeem the property, but a recognition of priority of lien over the First National Bank of Columbus, the question of Gordon's absolute good faith is a very serious matter; but in the aspect given to his case by his amended bill, wherein he seeks no priority, but the simple right to redeem, and particularly in view of the admitted fact that the First National Bank of Columbus obtained, and still retains, the benefit of at least $1,000 advanced by Gordon to Smith, Gordon's absolute good faith, within the strict definition of an innocent purchaser for value, is of very little importance.

It is also urged in defense that Gordon's right to redeem must be denied because he has not made a sufficient tender in fact, or in his bill. Before Smith's right to redeem, under any view of the case, expired, Gordon, as the holder of bonds of the Wolf Creek Coal Company, which bonds were secured by deed of trust or mortgage on the lands in controversy, offered to redeem the said lands from the sale under the Rucker mortgage, and for this purpose tendered to the purchaser (for the tender was both to the First National Bank of Columbus and to Williams, the nominal purchaser) the sum of $3,000, the price paid by the purchaser at the sale of the property, with 10 per cent. interest thereon, and in addition thereto all lawful costs and charges on said land accruing after the purchase. This tender was rejected for the assigned reason that Gordon had no right to redeem, and that a redemption by Smith, or on his part, must be in amount sufficient to cover, in addition to the amount of the Rucker mortgage, the judgments in favor of Gibson and in favor of the bank; for it is on this theory only that the amount required would be near as much as the $8,500, which was the amount given by Williams for himself and the bank as the minimum for which redemption would be permitted. In the original bill the complainant offers to redeem from all the liens claimed by the defendants, when the same shall have been justly and truly ascertained according to law; and in the amended bill, after reciting the tender as aforesaid, the complainant offers to pay into court the amount tendered, or any sum which the court may determine to be proper, and to do and perform whatever may appear equitable and right in the premises. Under the circumstances of this case, considering the involved character of the title, by reason of the judgments against Smith, the inability of Gordon to know, until after an account should be taken, exactly what sum would be necessary to redeem, and considering the equity resulting in favor of Gordon from the denial of the First National Bank of Columbus and its representatives that any sum had been furnished by Smith towards acquiring the Gibson judgment, and further considering that when the tender was actually made on behalf of Gordon the First National Bank of Columbus, by its representatives, denied his right to redeem, and, as to a redemption on the part of Smith, insisted upon an amount based upon the par value of the Gibson judgment, without any credit whatever for the $1,000 advanced by Smith, we are inclined to the opinion that complainant's offer to do equity is all that equity requires.

"The complainant below has brought his bill within the time allowed by the statute. He offers to pay (and proposes to bring the money into court for that purpose) any sum which the chancellor may decree to be paid by him as the consideration on which he should redeem, and the amount to be paid is yet to be ascertained by the master. Until it is ascertained, it is not incumbent on the party to bring the money into court. He does not know how much to bring. That the offer made by the bill is sufficient, see Smith, Ch. Pr. 8; Daniell, Ch. Pr.; Colombian Government v. Rothschild, 1 Sim. 94; Nelson v. Dunn, 15 Ala. 515." Freeman v. Jordan, 17 Ala. 500.

"If the purchaser only objects to the amount tendered, and declares that he is not satisfied that the complainant is a bona fide creditor, he cannot afterwards raise an objection to the authority of the person through whom the tender was made, nor to the fact that the money was tendered in bank notes." Couthway v. Berghaus, 25 Ala. 393.

"The right to redeem is not perfect, and cannot be enforced in equity, until there has been either a full performance by the plaintiff of all the statutory requisitions, or a valid and sufficient excuse for his nonperformance, without any fault or neglect on his own part; and when the bill alleges an excuse for such nonperformance the excuse must be accompanied with an offer in the bill to perform all the statute requires. If the bill does not show that the tender was made before it was filed, a tender made in it is not sufficient to authorize a decree of redemption, unless, in connection with such offer, the bill also shows a valid and sufficient excuse for the omission to make the tender before it was filed." Spoor v. Phillips, 27 Ala. 193.

"An offer in the bill to do equity is sufficient, a good and proper excuse being shown for not having made a tender of the amount admitted to be due prior to the filing of the bill. It is made clearly to appear that Tulane had conveyed the property to Louis Bates, and that each of them repudiated the claim set up to it by the complainant. The offer would have been fruitless, and the law never requires the performance of a nugatory act. Robbins v. Battle House Co., 74 Ala. 499; Elliott v. Boaz, 9 Ala. 772." Bates v. Kelly, 80 Ala. 142.

See, also, Pryor v. Hollinger, 88 Ala. 405, 6 South. 760.

It is also urged that the tender and the demand for redemption made on behalf of Gordon cover, as does the prayer of Gordon's bill, 120 acres as a part of the 840 acres which is included in the mortgage of Smith to Rucker, but which is not included in the deed of trust of the Wolf Creek Coal Company to Quintard, trustee, and that, therefore, Gordon is seeking to redeem a large quantity of land, in which he can claim no equity whatever. To this it is to be answered that Smith, in his letters, assured Gordon that he would give him a first lien on the 840 acres purchased from Gen. Rucker, and the Quintard mortgage describes the property as 840 acres conveyed, to wit, by W. J. Smith, and expressly convenanted for all further requisite deeds and assurances for conveying the premises, and that it would warrant and forever defend the same. When, therefore, Gordon made the formal tender by his attorney in fact, and renewed it in his bill, to redeem the 840 acres described, his tender and the other allegations in the bill concur, and are correct.

The appellees invoke the statute of frauds, but, if such statute would be otherwise applicable in the case, it cannot be applied against Gordon exercising the right of Smith, because, as between Smith and the appellees, there has been partial performance by the payment and application of the $1,000. See Anthe v. Heide, 85 Ala. 236, 4 South. 380.

Other defenses, mainly consisting of irregularities, are urged against the appellant, such as not making actual tender before

filing original bill, and the failure to take a second decree pro confesso against Smith after filing the so-called amended bill, and before final submission of the cause. We do not think that the failure to make a tender before the filing of the original bill necessarily defeats complainant's equity, under the circumstances developed. On a remanding of the cause, which is necessary in our view of the case, and particularly if the case was heard in the circuit court before issue joined, it will not be too late, before entering another decree, to take a pro confesso against Smith.

Our conclusion on the whole case is that the decree appealed from should be reversed, and the cause remanded to the circuit court, with instructions to enter a decree in favor of the complainant, to the effect that an account be taken of the amounts of the several liens due on the 15th of July, 1887, on the property described in complainant's bill and held in the names of the defendants Johnston, Williams, and the First National Bank of Columbus, or either of them, crediting upon the same the sum or sums paid on account thereof by the complainant, Gordon, and the defendant Smith, or either of them, together with such deductions for rents and profits as equity may require, and, after such accounting, that complainant, Gordon, be allowed to pay off the said liens, as so ascertained, and redeem the lands described in the bill, within a reasonable day, to be named by the court, and, further, that the amount of said liens, when paid by the complainant, Gordon, shall be added to his own lien for $5,000, with interest, and that the property described in the complainant's bill be sold to satisfy said complainant's lien, as so ascertained and determined; and it is so ordered.