## ENFORCEMENT OF PAROL AGREEMENT TO DISPOSE OF REAL PROPERTY BY WILL.

Superior Court of Cincinnati.

ELIZABETH GRAMANN v. PAULINE BORGMANN AND AUGUST BORG-MANN, ADMINISTRATOR WITH THE WILL ANNEXED OF JOHN SHAFER, DECEASED.

Decided, May 26, 1913.

*Conveyance—Contract for Transfer of Property by Will—Enforcible by Decree, When—Heir Thereto Treated as a Trustee—Conditions Requisite and Degree of Proof Required Upon which to Base Such a Decree—Statute of Frauds—Section 8617.*

1. A parol agreement to dispose of real property in a particular manner, by last will and testament, may be specifically enforced by a court of equity, by treating an heir as trustee, and requiring such heir to convey the property in accordance with the terms of the contract.
2. Such performance will be required when the promisee has wholly performed her part of the agreement, the existence of which is established by clear and convincing proof, where it is impossible to restore her to her prior status, and where the non-fulfillment by the promisor operates as a fraud.

*Chester W. Merrill,* for plaintiff.
*Joseph B. Schroeder* and *Dempsey & Nieberding,* contra.

OPPENHEIMER, J.

This is a suit in equity to enforce specific performance of a contract to make a testamentary disposition of real estate.

Plaintiff alleges that on or about May 17, 1872, John Shafer, who was her stepfather and who had been her guardian since the death of her own father, induced her to make settlement of the estate which she had received from her father and to convey to him valuable real estate situated in Milwaukee, Wisconsin, upon consideration of his verbal promise to provide by will that she should, at the time of his death, receive as large a portion of his estate as any of his own children; that relying upon such promise she performed all that she was required by the terms

of their agreement to perform, releasing all claims against said Shafer as her guardian and conveying to him the real estate referred to; but that said Shafer died on December 11, 1905, without keeping his agreement, having devised substantially all his property to the defendant, Pauline Borgmann.

Plaintiff further alleges that all the property left by John Shafer has been sold to pay debts, except one piece located at the northeast corner of Richmond street and Central avenue, in Cincinnati, of which defendant, Pauline Borgmann, is now in sole possession.

Plaintiff then asks that August Borgmann, administrator, be compelled to set up any claim which he may have against said real estate, and that the defendant, Pauline Borgmann, be compelled to execute a deed to plaintiff for an undivided one-third of said real estate, and to account to her for one-third of the rents received since December 11, 1905.

By subsequent entry, the death of August Borgmann is suggested and Joseph B. Schroeder, his successor, is substituted as a party defendant.

An answer was filed by Pauline Borgmann, in which the death of John Shafer, the appointment of August Borgmann as administrator with the will annexed, and the ownership by said Shafer of the property described in the petition, are admitted and all other allegations of the petition are denied.

On the day of the hearing of the case, the defendant, Pauline Borgmann, presented and asked leave to file an amended answer, in which she alleges that as Catherine Deeken, sister of the plaintiff, was a party to the alleged agreement with John Shafer, she should be made a party defendant in the case. She further states, as a second defense, that the alleged agreement is within the statute of frauds (General Code, Section 8620), and that no note or memorandum in writing was ever made by John Shafer or anyone authorized by him. The third defense is almost indentical with the original answer. We shall later consider the propriety of filing this amended answer.

The testimony shows that plaintiff is a daughter of Herman H. Deeken, who died in 1849, leaving a widow, Mary Deeken, and

three children, Elizabeth Deeken (now Elizabeth Gramann, the plaintiff in this case), Mary Deeken, and Catherine Deeken (now Catherine Lander), the last named being a posthumous child.   In 1850, Mary Deeken, widow of Herman H. Deeken, married John Shafer, who was appointed by the Probate Court of Hamilton County, Ohio, as guardian of the minor children of his wife.   In 1864 Mary Deeken, the second of these minor wards, died unmarried and without issue, but John Shafer continued to act as guardian of the surviving children.

When Herman H. Deeken died, he left a house and lot situated on Clinton street, in this city, and a brickyard, also situated in this city—the exact location of the brickyard not being clear from the evidence.   He also left a small farm in Illinois and a tract of nearly ten acres in size which had been subdivided into sixty-four lots in Milwaukee, Wisconsin.   All this property he bequeathed to his widow with the proviso that upon her death *or remarriage* it should pass to and vest in his children, and it is admitted that the several parcels became the absolute property of plaintiff and her sisters immediately upon the marriage of their mother and John Shafer, in 1850, and that plaintiff and her sister Catherine, inherited the share of Mary Deeken in 1864, thus becoming each the sole owner of an undivided half of any property which remained at the times hereinafter mentioned.

In 1868 John Shafer settled his accounts as guardian of Elizabeth and Catherine Deeken, and though the accounts which were probably filed by him in the probate court of this county were destroyed in the court house fire of 1884, yet an original account book kept in his own handwriting has been introduced in evidence.   For the purposes of this case it may be assumed that the recitals in that account book are substantially the same as those contained in the final accounts filed by him in court.   In this account, which purports to cover that period between July 2, 1851, and January 1, 1868, the children were charged with all sums expended for their care and the care of their property, and, in addition thereto, with board ranging in amount from $2.50 to $5.00 per week.   There is one charge,

under date of January 1, 1857, "for support of three children for three years at $2.50 per week, $2,340.00." This sum is twice as large as it should be, but as it was probably intended to cover six years, the total may be correct. The entire amount charged against the two children, who were living in 1868, was $6,464.47, of which plaintiff assumed $3,096.23, and Catherine Deeken assumed $3,368.23, for which they gave their notes secured by mortgages on their respective interests in the Milwaukee property.

Plaintiff and her sister appear to have been governed in all matters by the advice of their stepfather and guardian, in whom they had implicit confidence. Both of them lived at home with their mother and stepfather, assisting from an early age with housework and sewing, and in addition thereto Catherine worked for several years as clerk and bar-maid in the grocery and saloon owened by Shafer.

In 1872 plaintiff and her sister deeded to John Shafer thirty-two lots in the city of Milwaukee, being one-half the property in that city of which they had become the owners in fee upon the remarriage of their mother, and these lots were subsequently sold by Shafer for an aggregate of $12,815.93, as appears from the account book to which reference has heretofore been made. At the time when the deed for these lots was executed and delivered to Shafer, he surrendered the notes which he held against the plaintiff and her sister and canceled the mortgages given to secure the notes.

For some time prior to his death, which occurred in 1905, Shafer made his home with plaintiff and her husband, on Garfield avenue, in this city. The house in which they resided had been owned by plaintiff herself, who mortgaged it to Shafer in 1895 for $600 and then conveyed it absolutely to him by deed of general warranty in 1901 for $3,550. This mortgage and deed, it appears from the evidence, were executed after plaintiff's husband had met with financial reverses which resulted in the loss of all the property which he had theretofore owned. Other loans were made by Shafer to plaintiff's husband, but these were, it seems, paid off.

When Shafer died, he left surviving him a son, John Shafer, who had disappeared from home several years before and had not been heard from, and a daughter, Pauline Shafer Borgmann, one of the parties defendant. He had executed a will on August 4, 1893, in which he bequeathed to his son, John, the sum of $5 and to a daughter of the son the sum of $100. The rest of his property he bequeathed to his wife for life, with remainder in fee to his daughter, Pauline Borgmann, defendant. But his wife had died within fourteen days of the execution of the will, and the son has never been heard from to the present day, and is doubtless dead. The administrator *de bonis non,* August Borgmann, paid the specific bequest of $100 to the granddaughter, and all property except the house and lot at Richmond street and Central avenue has been sold to pay debts. That property is now in possession of Pauline Borgmann, defendant, and is the property in controversy in this case.

Two questions now arise: (1) Was there in fact an agreement such as is alleged in the petition? and (2) If there was such an agreement is it enforceable in equity?

The existence of an agreement to dispose of property in a particular manner by will can not, of course, be presumed, nor can it be established by a mere preponderance of the evidence. The testimony must be clear, cogent and convincing, so as to create in the mind a condition which makes it possible to ''say with a degree of positive assurance'' that such an agreement was in fact made and that the minds of all parties met upon its terms. Anything short of such proof will fail to satisfy the requirements of the law.

It is not strange that there should be some difficulty in presenting testimony of the required strength concerning matters which transpired so long ago. The agreement upon which plaintiff relies was made, if at all, at a meeting which took place in the office or residence of John Kebler, an attorney engaged in the practice of the law in this city, in 1872. There were present at that meeting Mr. Kebler, Shafer, the plaintiff and her husband, John Gramann, and the plaintiff's sister, Catherine Deeken (now Catherine Lander). Kebler and Shafer

are dead, and the plaintiff herself is disqualified from testifying by the provisions of Section 11495 of the General Code. We are therefore compelled to rely upon the testimony of John Gramann and Mrs. Lander, for the purpose of determining what occurred at that meeting, and testimony concerning occurrences of forty-one years ago is necessarily somewhat indefinite.

Gramann testifies that when he married Elizabeth Deeken, in 1872, he learned that settlement had been made by Shafer with his two stepdaughters, and that he was convinced that the settlement was not fair; that he went to Shafer and expressed himself to that effect, and demanded of Shafer a settlement of the guardianship matters; that Shafer expressed his willingness to make an amicable settlement, but urged that the subject be not brought to the attention of any of his friends as he did not want them to know about the controversy, and that he finally suggested that Gramann and his wife, together with her sister, meet him at the residence of Kebler on the evening of May 14, 1872. Catherine Deeken was notified of this meeting, and at the appointed time the five persons heretofore named met. It appears that Shafer had previously arranged with Kebler, who had acted as his personal counsel, to have certain documents prepared; and at this meeting Shafer promised and agreed that if the two stepdaughters would deed to him one-half of their Milwaukee property he would return their notes and cancel their mortgages, and that he would further make an equal division, between them and his own children, of all property which he might leave at the time of his death, treating the stepdaughters in all respects in the manner in which he would treat his own children who might survive him. As a result of this agreement on Shafer's part, plaintiff, her husband and her sister signed a deed conveying thirty-two of the sixty-four lots in Milwaukee to Shafer, who then returned their notes and canceled the mortgages which they had given him. The deed had been prepared prior to the meeting, and the consideration recited therein was the cancellation of the mortgages and the surrender of the notes. There is no reference to any contemporaneous agreement for the testamentary disposition of

property; but as the deed was prepared by Shafer's own counsel in anticipation of the meeting, we attach no importance to this omission, particularly in view of the fact that it was not such an agreement as would ordinarily be recited in a deed. Both Gramann and Mrs. Lander testify that the deed was not read over to them at the time and that it was signed by reason of and in sole reliance upon the agreement and promise made by Shafer.

Indeed, the testimony of Gramann and Mrs. Lander does not differ in any essential respect. They do not attempt at this date to give the exact language of the promise, but they state in substance that this was the nature of the agreement, and that no one was present except the parties hereinbefore named. The deed was acknowledged before Clarke B. Montgomery, a notary public, who is still living, but who, it is stipulated, states that he remembers absolutely nothing of the transaction and does not recall that he was present at the time when the meeting took place.

Corroboration of the evidence of Gramann and Mrs. Lander is found in the testimony of Mrs. Louis Esselman, a daughter of the plaintiff. Mrs. Esselman testifies that while Shafer lived with them in the house on Garfield avenue, she heard him say on numerous occasions that he intended to do as much for her mother and aunt (Mrs. Lander) at the time of his death as for his own children, and that immediately prior to his death he sent for a lawyer to make a new will, but that she does not know whether or not such will was made. The testimony would indicate that the lawyer for whom he sent was Mr. Arnold Speiser, now dead, who probably drew a will at the time, but that said will was not finally executed or presented for probate.

Some stress is laid upon the fact that Mrs. Esselman is unable to give the dates when any of these statements were made, or to state who, besides herself, was present when such statements were made. It is not peculiar, however, in our opinion, that the dates can not be given when the testimony indicates that the statements were made on repeated occasions during a period of three or four years, nor is it strange that such matters as this, relating solely to family affairs, would not be discussed in the

presence of outsiders. We look upon the testimony of Mrs. Esselman as corroborative of the testimony of Mr. Gramann and Mrs. Lander, and as indicating the existence of an agreement on the part of Mr. Shafer, who desired it to appear that he intended to keep such agreement.

The only witness for defendant is Mrs. Borgmann, who says that she never heard Mr. Shafer make such statement; but it is hardly probable that he would have said to her or in her presence that he intended to deprive her of a share of the property which she would otherwise receive at his death, just as it is highly probable that he would have said to Mrs. Gramann or Mrs. Esselman (who is Mrs. Gramann's only child and sole heir) that he intended to carry out his promise to leave his stepdaughter a share in his estate. It is therefore apparent to us that the agreement set out by plaintiff in her petition was actually made.

Having determined that the existence of an agreement has been shown, we are next to consider whether this agreement is enforceable in a court of equity.

Section 8621 of the General Code of Ohio provides that:

"No action shall be brought whereby to charge the defendant * * * upon a contract or sale of lands, tenements or hereditaments, or interest in or concerning them, * * * unless the agreement upon which such action is brought, or some memorandum or note thereof is in writing, and signed by the party to be charged therewith, or some other person thereunto by him or her lawfully authorized."

It is apparent that this statute does not apply, unless there is a contract. But the fact that the testimony conclusively establishes the existence of such contract is not in itself sufficient. There must be something more to enable a party thereto to predicate an action upon the contract. In other words, there may be a perfectly valid agreement which, by reason of some formal omission or defect, is unenforceable in an action at law. The statute does not touch the formation of the contract, but concerns itself merely with the evidence whereby the contract is to be established; or, as it is frequently expressed, it is a rule of adjective, not of substantive, law. *Heaton* v. *Eldridge,* 56 Ohio State, 87; *Crawford* v. *Edison,* 45 Ohio State, 239. Such con-

tracts have been accurately termed "agreements of imperfect obligation." *Wald's Pollock on Contracts,* Williston's Ed., Chap. 13. They stand midway between contracts which may be actively enforced and agreements which have no legal effect whatever. They create rights without legal remedies, that is, without "apropriate processes of law by which the authority of a competent court can be set in motion to enforce the right." They are not void and the statute does not extinguish the obligation which has been created by them. *Townsend* v. *Hargraves,* 118 Mass., 325. Indeed, the contract may be made the basis of an action and the protection of the statute will not be available to the defendant unless he expressly invokes it, except where, as in Wisconsin, the statute by its terms absolutely extinguishes the right. *Ogden* v. *Ogden,* 4 Ohio State, 182; *Pierce* v. *Seymour,* 52 Wis., 272. And no advantage of the statute may be claimed by others than parties to the contract or those in privity with them. *Lefferson* v. *Dallas,* 20 Ohio State, 68; *Moore* v. *Crawford,* 130 U. S., 122. And if the contract has been fully performed on both sides, the statute ceases to have any application to it. *Stone* v. *Dennison,* 13 Pick., 1.

The statute under consideration is commonly known as the statute of frauds. It is intended to prevent, and not to facilitate the perpetration of fraud. It is designed as a shield to be used by the righteous, and not as a sword to be employed by the unconscionable who wish to "eat their cake and keep it too." Therefore, courts of equity have seen fit to relieve from the harsh results which would follow the strict enforcement of the statutory rule by requiring specific performance of such informal agreements when there has been a part performance by one party, on the faith of an existing contract, if the existence of such agreement is reasonably inferable from the acts themselves and if the acts have been such as to prevent the restoration of the parties to their original position. It is not necessary, at least in this state, that the acts of part performance be referable to the contract which is set out, and to no other contract whatever. It is sufficient if they "clearly refer to some contract in relation to the subject-matter in dispute; its terms may then be established by parol." *Shahan* v. *Swan,* 48 Ohio State, 25, 37; Cf. *Bird* v.

*Jacobus,* 113 Iowa, 194, 200. This rule has been tersely stated in many cases to be that where the former status of the parties can not be restored, and failure to enforce an agreement would operate as a fraud because of the change of status, the statute of frauds does not apply. *Allen* v. *Moore,* 70 Pac. (Col.), 682; *Gladville* v. *McDole,* 93 N. E. (Ill.), 86; *Quinn* v. *Telephone Co.,* 122 Ill. App., 133; *Teague* v. *Fowler,* 56 Ind., 569; *Bull* v. *Bull,* 91 Ind., 305; *Svanburg* v. *Fosseen,* 75 Minn., 350; *Freeman* v. *Freeman,* 143 N. Y., 34; *Brinton* v. *Van Cott,* 8 Utah, 480; *Neales* v. *Neales,* 9 Wallace, 1; *Pomeroy on Specive Performance,* Sec. 135.

This equitable doctrine can not be properly called a substitution of proof of an oral agreement and part performance for the evidence required by the statute. It is rather an enforcement of the principle of estoppel, which operates to prevent one from setting up the legal invalidity of an agreement on the faith of which he has induced the other party to alter his position. *Watson* v. *Erb,* 33 Ohio State, 35.

It may, of course, be assumed that if equity would decree specific performance as between the original parties to such a contract as the one set up in this case, it would also enforce such performance as to all who claim under them, unless intervening equities would make the decree work an injustice toward these parties. *Parsons on Contracts,* Vol. III, page 407.

There can be no doubt that one may enter into a valid agreement binding himself to make a particular disposition of real property by last will and testament, and a court of equity has undoubted power to decree the specific performance of such an agreement. *Emery* v. *Darling,* 50 Ohio State, 160; *Jaffee* v. *Jacobson,* 48 Fed., 21; *Townsend* v. *Vanderwerken,* 160 U. S., 171; *Owens* v. *McNally,* 113 Cal., 444; *Rivers* v. *Rivers, Exr.,* 3 Dessau, 195; *Bird* v. *Jacobus,* 113 Iowa, 194; *Dicken* v. *McKinley,* 163 Ill., 318, 322; *Woods* v. *Matlock,* 19 Ind. App., 364; *Wellington* v. *Apthorp,* 145 Mass., 69; *Carmichael* v. *Carmichael,* 72 Mich., 76; *Wright* v. *Wright,* 99 Mich., 170; *Kofka* v. *Rosicky,* 41 Neb., 328; *Johnson* v. *Hubbell,* 2 Stock. (N. J. Eq.), 332; *Parsell* v. *Stryker,* 41 N. Y., 480; *Green* v. *Broyles,* 3 Hump. (Tenn.), 167; 26 Am. & Eng. Enc. Law, 91-3.

In the case of *Owens* v. *McNally, supra,* the court expresses itself thus (page 448):

"Without entering upon any extended review of the authorities, there is and has been, from a very early date, a general concurrence among them upon the proposition that a man may make a valid agreement binding himself to dispose of his property in a particular way by his last will and testament, and a court of equity will enforce such an agreement specifically by treating the heirs as trustees, and compelling them to convey the property in accordance with the terms of the contract."

Indeed, not only will a court of equity enforce the specific performance of a parol contract to devise real estate, but it sometimes will, upon the equitable principle of *quia timet,* prevent an attempt to violate the agreement by the conveyance of the land during the lifetime of the promisor. *Duvale* v. *Duvale,* 55 N. J. Eq., 581.

The leading case in this country seems to be *Johnson* v. *Hubbell, supra.* In that case an agreement had been made between father and son that if the latter would convey to his sister a portion of the property which he had inherited from his mother, the father would leave his own property by will equally to the son and daughter, the father threatening to dispose of his property otherwise if the son did not comply with this demand. The son accordingly made the required conveyance, but when the father's will was probated, it was found that the son had been cut off from all right and participation in the estate. Suit was filed by the son against the devisees in possession, and a decree for specific performance was entered. Said the court (page 338):

"If one party to a parol agreement has wholly or partially performed on his part, so that its non-fulfillment by the other party is a fraud, the court will compel a performance."

In *Carmichael* v. *Carmichael, supra,* the court enforced an agreement to make mutual wills at the suit of parties whose interests were affected by the failure of their mother to carry out her part of such an agreement, their father having fully performed his part thereof.

In the case of *Whiton* v. *Whiton,* 179 Ill., 32, is was held that:

"An agreement to make a will in a particular manner will be enforced in equity after the promisor's death, as against heirs, devisees and personal representatives of the deceased person, where the agreement is established by clear proof and the consideration therefor is sufficient."

We have not attempted to make an exhaustive citation of cases bearing upon the subject, but to indicate that the concensus of opinion seems to bear out the principle heretofore enunciated by us. Let us now ascertain whether the facts in the case at bar bring it within this principle.

There can, in our opinion, be no doubt that the agreement set out in the petition was actually made. While the witnesses who testify to its existence are doubtless interested, as defendant contends, yet they are apparently candid, fair and trustworthy, and their testimony has been in nowise impeached. Plaintiff parted, upon the faith of that agreement, with property which was worth a great deal more than any present consideration which was given by her stepfather. And while we have no right to pass upon the correctness of the accounts filed in the probate court forty-five years ago, yet we can not refrain from remarking that a degree of suspicion necessarily attaches to a settlement which charges members of a household with board at the rate of $5.00 per week while they were contemporaneously giving their services without compensation as domestic servants, seamstresses and bar-maids. Nor can plaintiff be restored to her original position as owner of the Milwaukee property, for the value of that property has unquestionably increased until it is to-day worth many times as much as it was worth when transferred by her. Plaintiff fully performed all which she was, by the terms of the agreement, required to perform; and as it is unreasonable to suppose that she would, except upon the faith of such an agreement, have parted with property and rights of the value of those which she surrendered, we are constrained to believe beyond a reasonable doubt that her acts were clearly referable to such a contract as that set up by her. To refuse to enforce the performance of the agreement would, under such circumstances, be to effectuate a fraud, and to permit John Shafer and his heirs

to profit unconscionably at the expense of those whose only fault was that they did not comprehend a law in the construction of which many legal minds have differed and that they reposed unwarranted confidence in one whom they looked upon as father, guardian, friend and adviser.

Defendant, Pauline Borgmann, is, of course, not charged with having participated in this fraud, and so the decree in this case can not be said to reflect opprobriously upon her.   Indeed, there is no reason for disbelieving her statement, that she had no knowledge of the alleged agreement until after the death of her father.   But in our opinion she has come into the possession of property which her father bound himself to transfer to plaintiff, and justice demands that she yield it up to her to whom it equitably belongs.

Defendant cites with assurance the case of *Shahan* v. *Swan*, *supra*.   While it is true that in that case the court refused to compel specific performance of a contract to bequeath land, yet it recognizes the enforceability of such contracts under proper conditions.   There were no living witnesses to the terms of the arrangement, and the only evidence thereof came from those who had heard declarations made by the testator more than forty years before the trial.   The acts relied upon were of such a character, as the court expressed it, "as are not usually the offspring of contractual relations," and were perfectly consistent with the absence of any contract whatever.   But the court says (page 40):

"We do not wish to be understood to hold that cases may not arise wherein specific performance of a contract in parol may be had on the ground that the consideration had been paid in personal services, not intended to be, and not susceptible of being measured by a pecuniary standard."

Defendant further cites *Pomeroy on Specific Performance*, Sec. 122, which lays down the rule that there must be possession of the very tract of land which forms the subject-matter of the suit in order to take a parol contract for the conveyance of land out of the statute of frauds. . But this section relates solely to a contract for the *sale* of land where the property involved in the action is definitely ascertained and capable of possession at

the time when the agreement is made. But where the contract is for a testamentary disposition of real property, it can not in the very nature of things be determined what property will be involved until the promisor dies, and until that time the character of the contract implies that the promisor shall remain in undisturbed possession. It will not for one moment be suggested that the promisee acquires any interest in property ·of which the promisor comes into possession, or that he could enjoin in equity, or otherwise interfere with, the free conveyance prior to the promisor's death of any property acquired by him, unless, as in the case of. *Duvale* v. *Duvale, supra,* the contract related specifically to certain property then owned by the promisor. So in the case at bar it appears that the property in controversy was acquired by Shafer subsequent to the agreement of 1872, and that after Shafer's death in 1905, when plaintiff for the first time would have had a right to take possession if the agreement had been fulfilled, the defendant, Pauline Borgmann, took possession under the will with the consent of the administrator. Plaintiff's very complaint therefore is that the defendants have prevented her from entering into possession; and to hold that absence of possession necessarily defeats plaintiff's right is to beg the question and to make the statute an instrumentality for the perpetration of fraud upon a person as punishment for the exhibition of an excess of credulity.

The same comment might be made upon *Purcell* v. *Miner,* 4 Wallace, 513, cited by defendant, which was an agreement for the exchange of lands *in praesenti.*

Defendant also cites *Ripson* v. *Hart,* 72 N. Y. Supp., 791. In that case, however, the court specifically adverts to the fact that plaintiff's claim was supported by the testimony of only one witness, and that there were "obvious facts and circumstances tending to contradict the making of a contract."

In the case of *Hill* v. *Wilson,* L. R., 8 Ch. App., 888, the facts were materially different from those in the case at bar. There was a written contract in the form of a promissory note, which plaintiff sought to have canceled on his own uncorroborated testimony concerning an oral agreement with a man since dead. Its worthlessness as an authority in this case is manifest.

*Howard* v. *Brower*, 37 Ohio State, 402, was an action at law for the recovery of money only, in which it was held that, as the parol contract involved real estate, it was within the statute of frauds, and that the defense of the statute was available on demurrer. The questions which arise in the case at bar were not considered.

*Crabill* v. *Marsh*, 38 Ohio State, 331, was likewise an action at law for damages for breach of contract. The court, at page 338, differentiates the case from an equitable proceeding to enforce specific performance and follows *Howard* v. *Brower, supra.*

*King* v. *Bordner*, 65 Ohio State, 86, was also an action at law in which reliance was placed on a letter as a memorandum sufficient to satisfy the requirements of the statute of frauds. The court finds that the letter was inadequate to accomplish the desired result and then remarks (103-4) that "the doctrine of part performance is enforced *only in equity* and can not avail to render a contract which is void by the statute because unwritten or unsigned capable of being directly sued on in a court of law." (Italics ours).

Defendant also cites the case of *Hopple* v. *Hopple,* 3 C. C., 102, which was carried to the Supreme Court, but was there dismissed for want of preparation. It is sufficient to say by way of comment upon that case that the court itself says (page 105) that there is no claim that anything was ever done which would avoid the plea of the statute of frauds.

Having therefore concluded that plaintiff has abundantly proved the existance of the contract on which she relies, and that the contract is enforceable in a court of equity, we revert to the question as to the propriety of filing the amended answer which was presented by counsel for defendant on the day of trial.

Plaintiff in this case originally filed her claim with the administrator, and the claim was disallowed by him. She thereupon filed an action at law to enforce the allowance of her claim on September 19, 1907 (Case No. 53489). To this petition a demurrer was filed, raising many of the points which are presented for our consideration in this case. This demurrer was overruled, and an answer was then filed in which the statute of

frauds was affirmatively pleaded. To this answer a demurrer was filed by plaintiff, and this demurrer was subsequently overruled by Honorable Harry M. Hoffheimer, then a judge of this court, upon the ground that the case should properly have been filed as an equitable proceeding and not as a suit at law. The plaintiff did not see fit to plead further, and on January 9, 1911, an entry was made granting judgment to the defendant. This case is now pending in the Court of Appeals, but it is practically agreed by the parties that the action is equitable and that this case will supersede the other.

The petition in the case at bar was filed January 3, 1911, and it was not until the day of trial, to-wit, May 5, 1913, nearly two and one-half years after the filing of the petition, that an attempt was made to have Catherine Deeken (Lander) made a party defendant. In the first place, we can not conceive that this application was made within a reasonable time, and the effect of allowing the filing of such an answer would, in our opinion, be to deprive the plaintiff of substantial justice by preventing Mrs. Lander from testifying. In addition thereto Mrs. Lander never presented her claim to the administrator, and has indicated no intention to press any claim; and as nearly eight years have elapsed since the death of John Shafer her claim is undoubtedly barred.

We therefore can not see that her participation in the case as a party thereto is necessary, or that justice would be subserved by forcing her to litigate if she does not desire to do so.

The application for leave to file the amended answer is therefore denied.

It is our opinion, then, that a decree should be drawn declaring Pauline Borgmann to be a trustee for plaintiff of one-third of the property described in the petition, and that she be required to execute and deliver to plaintiff a deed of general warranty conveying to said plaintiff an undivided one-third of said property, and that she be compelled to account to plaintiff for one-third of the rents received from said property since the death of said John Shafer.